# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 14, 2012          Decided July 24, 2012

No. 11-1277

SUTTER EAST BAY HOSPITALS, DOING BUSINESS AS ALTA
BATES SUMMIT MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 11-1318

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

*Christopher T. Scanlan* argued the cause for petitioner.
With him on the briefs were *David S. Durham* and *Gilbert J.
Tsai*.

*Milakshmi V. Rajapakse*, Attorney, National Labor
Relations Board, argued the cause for respondent. With her on
the brief was *John H. Ferguson*, Associate General Counsel,
*Linda Dreeben*, Deputy Associate General Counsel, and *Robert
J. Englehart*, Supervisory Attorney.

*Michelle M. Devitt*, Trial Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Petitioner Sutter East Bay Hospitals seeks review of a National Labor Relations Board ("NLRB" or "Board") order concluding that Sutter East Bay violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (3). *See Alta Bates Summit Med. Ctr. and Nat'l Union of Healthcare Workers*, 357 NLRB No. 31, 2011 WL 3269362 (July 29, 2011) ("Board Decision"). The Board cross-applies for enforcement of that order. Sutter East Bay concedes that it engaged in illegal surveillance of its employees' union activities, and we grant the Board's application for enforcement of that determination. We also grant the Board's application for enforcement of the finding that Sutter East Bay unlawfully changed its solicitation policy to stifle support for a new labor union. We agree with Sutter East Bay, however, that the administrative law judge failed to properly apply the appropriate legal standard in determining that the employer unlawfully disciplined its employee, Beverly Griffith. We therefore grant Sutter East Bay's petition for review with regard to those disciplinary actions, vacate the relevant factual findings and conclusions, and remand to the Board for rehearing.

## I. Background

Sutter East Bay operates four hospital facilities in northern California, including the Summit Hospital campus in Oakland and the Alta Bates Hospital facility in Berkeley. The events at issue here relate to a conflict between two unions

present at Sutter East Bay's hospitals. Service Employees International Union ("SEIU") had originally represented union workers at the hospitals, but after the national organization placed the local chapter in trusteeship in January 2009, the ousted leadership and other employees worked to decertify SEIU and certify a replacement, the National Union of Healthcare Workers ("NUHW"). Board Decision at 5 (ALJ Op.). Beverly Griffith, an environmental-services worker and displaced SEIU steward, was one of the employees supporting NUHW. She is the subject of the disciplinary actions found unlawful by the Board in this case. Many of the facts are disputed by the parties. Based on the findings of the Board and the evidence in the record, we set them forth briefly and note key areas of disagreement. *See id.* at 4–21 (describing the facts of the case and conflicting testimony in detail).

## A. The Water-Spilling Incident

The first incident occurred on February 17, 2009, when two SEIU representatives, Carlos Hernandez and Erica McDuffie, visited Alta Bates Hospital. Hernandez testified that he and McDuffie were followed in the hospital by Griffith and another employee, who harassed them and called them "scabs." *Id.* at 8. According to Hernandez, Griffith followed the SEIU representatives to the cafeteria and sat close to where they were sitting. Eventually, Hernandez testified, Griffith left and returned with two cups of water. *Id.* at 8–9. Shortly after, Hernandez looked up and noticed that Griffith had spilled her water, which was flowing toward the SEIU employees and their belongings. *Id.* McDuffie accused Griffith of spilling the water intentionally and reported the incident to the security guard present in the cafeteria; Griffith approached security and told the guard that the spill was an accident. The security officers wrote up the conflicting accounts in a report that described the incident without placing blame. *Id.* at 9. In her own testimony, Griffith

contended that she was already sitting in the cafeteria when the SEIU employees arrived, and that Hernandez and McDuffie sat near her and tried to convince her to support SEIU. *Id.* Griffith did not dispute that she spilled the water, but testified that she accidentally spilled it as she stood up to leave.

Three days after the incident, McDuffie called Bruce Hatten, Sutter East Bay's Labor Relations Specialist, to complain that hospital employees were placing NUHW literature on SEIU bulletin boards. *Id.* During that conversation, McDuffie complained that Griffith had been rude during the visit and had intentionally spilled water on the SEIU representatives. Hatten then obtained a copy of the security report and, without interviewing Hernandez, the security officer, or Griffith, drew up a written reprimand for "misconduct and inappropriate behavior" and gave it to Griffith. *Id.* at 10. According to Griffith's testimony, she protested that Hatten had not asked for her side of the story, and Hatten responded that the behavior "sounds like [Griffith]." *Id.* Griffith wrote on the disciplinary form that she was being harassed by Hatten and SEIU, and that there was no investigation of the incident prior to the discipline.

## B. The March 20 Cafeteria Incident

The next incident occurred on March 20, 2009, when Griffith and other SEIU stewards held an all-day "membership meeting" in the Summit Hospital cafeteria to build support for NUHW. The stewards had previously publicized the meeting by posting and distributing leaflets, and the meeting was designed so that the stewards would take a vacation day and sit in the cafeteria to discuss union matters with employees whenever those employees were on lunch or break. *Id.* at 11.

Having heard in advance about the meeting, Sutter East Bay sent to NUHW on March 13 a cease-and-desist letter stating that the hospital is private property and does not allow outside groups to meet on its premises. *Id.* In addition, Bruce Hatten hired Allied Barton Security Services to provide private security guards, and he instructed those guards to report in suits instead of uniforms. Hatten gave the guards a camera and instructed them to watch for activity by the members of the new union and to report any union solicitation or distribution to Hatten right away. *Id.* He specifically identified Griffith as one of the employees to watch. *Id.*

During the March 20 membership meeting, Hatten and one of the security guards approached the table after Griffith and another steward, Deborah Kirtman, finished talking to a group of employees. There was a brief confrontation, wherein Hatten grabbed a stack of flyers and informed Griffith and Kirtman that they were not allowed to conduct meetings for outside unions, to distribute literature, or to solicit funds. Kirtman responded by stating that the employees remained stewards for SEIU and had a right to inform their members. Hatten and Parks then left the cafeteria. *Id.* at 12. Throughout the day, Sutter East Bay's hired security guards sat near the employees and recorded their activities, though the security guards testified that they did not observe any union business after the confrontation. *Id.* at 11–13.

## C. The March 23 Cafeteria Incident

Employees held another all-day meeting the following Monday, this time in the cafeteria of Alta Bates Hospital. *Id.* at 14. Griffith scheduled a vacation day and organized the event. Griffith and DeAnn Horne, a ward clerk at Alta Bates, arrived early in the morning, met another clerk, and placed stacks of flyers and documents on a table in the corner of the dining area. Across the dining room, Hatten was sitting with another

employee and two hired security guards, Ronnie Parks and Mahir Said. *Id.* Shortly after Griffith and Horne arrived, Hatten left the cafeteria. *Id.*

While Horne left the cafeteria to inform employees that Griffith was available to talk, Griffith walked over to a table of dietary workers and spoke with them, standing at first and then sitting with them. After a few minutes, Griffith returned to her table and Horne returned as well. Shortly thereafter, Hatten returned to the cafeteria and approached the employees. According to the employees, Hatten told them, "I need you to cease and disperse . . . . I'm giving you a direct order to leave the premises now." *Id.* As to his motivation for expelling the employees from the cafeteria, Hatten testified that security guard Parks had called him to report that Griffith had addressed the dietary employees loudly and had solicited money from them for union dues. *Id.* at 15. Parks also included in a report on the events of March 23 that Griffith had moved to two different tables talking with employees. Griffith, in her own testimony, denied talking in a loud voice at any time and claimed she only moved to the dietitians' table and back to her own.

Testimony again differed as to what happened after Hatten ordered the employees to leave: Griffith stated that she asked to borrow Horne's cell phone to arrange a ride home, and, as Griffith and Horne were gathering their belongings, Hatten again ordered them to leave and threatened them with suspension. *Id.* Griffith testified that Hatten never actually suspended her. *Id.* at 14–16. Horne corroborated Griffith's testimony, stating that security personnel arrived as the employees were departing and that Hatten never suspended Griffith. Security Guard Parks, however, testified that Horne, upon being ordered to leave, said "I'm outa here" and left, while Griffith stayed behind and picked up her cell phone to call her lawyer. *Id.* at 15. At that point, Parks testified, Hatten stated

that Griffith appeared unwilling to comply and that he would consider her to be disobeying his order if she did not depart before security arrived. *Id.* Parks testified that Griffith was still slowly packing her things when security arrived to escort her out, and Hatten placed her on suspension at that time. *Id.* Hatten, in turn, gave testimony that was similar to Parks', although Hatten stated that he suspended Griffith before security was even called to escort her out, and that Griffith was "defiant" and refused to comply with his order. *Id.* at 15–16. Sutter East Bay also provided testimony from another security guard who was part of the detail that arrived to escort Griffith out of the building; she claimed to have witnessed the suspension. *Id.* at 16.

### D.  The March 24 Profane Tirade and Griffith's Termination

The next day, Griffith arrived in uniform five minutes before her scheduled 7:00 am shift. *Id.* at 17. Griffith had arrived early to hand out flyers regarding the cafeteria confrontation the previous day. She was in the environmental-services lounge when a supervisor, Tito Aquino, asked her to step outside and speak with him. *Id.* Griffith initially refused but eventually complied and brought a coworker, Lawana Williams, with her. After walking Griffith down the hall roughly fifteen feet, Aquino informed Griffith that she had been suspended but that he did not know the reason for the suspension. *Id.* at 17–18. Griffith demanded written notice of her suspension and its reasoning; Aquino refused, told her to leave, and called security to escort her. *Id.*

Yet another series of disputed events followed. Sutter East Bay claims that Griffith returned to the break room and began a tirade of profanity, including statements such as: "Did you all hear that? I'm being f***ing suspended. I can't even

speak to you in a f***ing public place." *Id.* at 18. Sutter East Bay offered Aquino's testimony, as well as that of Carla Biddle, another supervisor who claimed to have witnessed much of the tirade while standing in the doorway of the break room. Biddle and Aquino submitted reports of the incident on the day it occurred. *Id.* at 19.

Griffith's version of events, which was corroborated by Lawana Williams, differed greatly from that of Biddle and Aquino. Griffith testified that after being informed of the suspension she asked Aquino if she could collect her belongings from the break room, and Aquino consented. *Id.* at 18. While doing so, Griffith testified, she told the other employees that she had been suspended, and in conversation with them said that the suspension was "bulls***" (or, according to Williams, merely "bull"). According to Griffith and Williams, there was no tirade and Griffith left within a few minutes.

Bruce Hatten interviewed Griffith two days later concerning the events of March 23–24. Among other things, Hatten asked if Griffith had gone to the hospital on March 24 with the intention of working and being paid. Griffith responded affirmatively, stating that she was unaware of her suspension. *Id.* at 20. Hatten also asked if she stood up and spoke to a group in the cafeteria on March 23, and Griffith said that she could not recall doing so. *Id.* Finally, Hatten asked if Griffith had used the word "f***ing" after being informed of her suspension. Griffith stated that she was not sure but that she might have done so. *Id.* On April 7, 2009, Sutter East Bay discharged Griffith based on her failure to obey Hatten's orders on March 23, for attempting to work while suspended, and for the tirade on March 24. *Id.* at 21.

### E. Proceedings Before the ALJ and Board

The National Union of Healthcare Workers filed unfair labor practice charges against Sutter East Bay in April 2009, alleging that Sutter East Bay violated the Act by 1) interfering with employees' rights under the Act by enforcing solicitation and distribution rules in a discriminatory manner and by retaliating against Griffith for supporting NUHW, 2) showing a preference for a rival union by threatening and disciplining Griffith for her support for NUHW, and 3) discriminating directly against Griffith for her support of NUHW by unjustly disciplining and suspending her. The Board, through its Regional Director, investigated the charges and issued a complaint against Sutter East Bay. The consolidated hearing on all charges took place before an ALJ from November 30 to December 3, 2009.

The ALJ largely agreed with NUHW's version of events, finding Hatten and Biddle to be "particularly disingenuous, deceitful, and not worthy of belief as to any aspect of his or her testimony." *Id.* at 21. The ALJ declared Hatten to be a "duplicitous witness, one whose primary intent, I believe, was to buttress [Sutter East Bay's] defense rather than to testify truthfully." *Id.* at 21–22. The ALJ found Biddle to be "internally inconsistent regarding seemingly innocuous, irrelevant points" regarding the March 24 incident. *Id.* at 22. Overall, the ALJ rejected much of the testimony of Sutter East Bay's witnesses as internally or externally inconsistent. The ALJ also disregarded as "fabrication[s]" both Biddle's and Aquino's contemporaneous written reports of the March 24 incident. *Id.* at 30 n.101. The ALJ rejected Aquino's report because it was a second draft and Aquino had not produced the first draft, and he rejected Biddle's report because it was drafted at Hatten's behest and was not identical to her testimony regarding the incident. *Id.*

Based on his findings, the ALJ concluded that several of Sutter East Bay's actions violated the Act. First, Sutter East Bay conducted unlawful surveillance of union activities taking place on hospital property. Second, Sutter East Bay unlawfully changed its solicitation policies to prevent employees from engaging in activities supporting NUHW. Third, Sutter East Bay unlawfully disciplined union-supporter Beverly Griffith for the water-spilling incident. Fourth, Sutter East Bay unlawfully evicted Griffith from the Alta Bates Hospital cafeteria, threatened to suspend her, and ultimately suspended her on March 23 because of her union-supporting activities. Fifth, Sutter East Bay unlawfully discharged Griffith in April 2009, again because of her support for NUHW. *Id.* at 30. The Board affirmed the ALJ's conclusions and reasoning with only minor modifications. *See id.* at 1–4 (Board Op.). The Board also rejected a motion by Sutter East Bay to reopen the record and allow Erica McDuffie to testify. *Id.* at 2.

Sutter East Bay petitions this court for review, arguing that the ALJ's conclusion that Sutter East Bay unlawfully changed its solicitation policy to hamper NUHW was not supported by substantial evidence and that the ALJ failed to correctly apply the appropriate test for determining whether the disciplinary actions against Griffith were lawful. Sutter East Bay does not, however, challenge the conclusion that it engaged in unlawful surveillance of union activities, *see* Pet'r's Br. at 2–3 n.2, and we therefore grant the Board's application for enforcement as to that issue. We discuss the remaining issues below.

## II. Changes to the Solicitation Policy

We first examine the Board's conclusion that Sutter East Bay violated Sections 8(a)(1) and 8(a)(3) of the Act by discriminatorily enforcing its solicitation and distribution rules

on March 20 and 23, 2009. The ALJ determined that prior to the events of March 2009, "employees had utilized the cafeterias for solicitations, including collecting union dues, and for distributing union-related literature without restriction." Board Decision at 27 (ALJ Op.). With regard to NUHW, however, the ALJ concluded that Sutter East Bay "redefined its solicitation/distribution rules" when it told Griffith and her fellow employees that they could not conduct a meeting for an "outside union," distribute literature, or solicit funds. *Id.* The ALJ noted that the cafeterias at Sutter East Bay's hospitals are not patient-care areas, which may by law be more stringently controlled by management. *See, e.g.*, *St. Johns Hosp. & Sch. of Nursing*, 222 N.L.R.B. 1150, 1150–51 (1976) (holding that a hospital may lawfully ban solicitations in patient-care areas). Finally, the ALJ specifically noted that Sutter East Bay placed no limitations on SEIU agents meeting with employees in the cafeterias and even allowed non-union, employee-to-employee solicitations, demonstrating the discriminatory nature of Sutter East Bay's rules. Board Decision at 6, 27 (ALJ Op.). The Board adopted the ALJ's findings and analysis. *Id.* at 1 (Board Op.).

**A.**

Sutter East Bay contends that it did not allow other unions to conduct meetings while preventing NUHW from doing the same, and that the ALJ's conclusion is not supported by substantial evidence. First, Sutter East Bay argues that the ALJ ignored evidence that it acted to prevent meetings in the past, pointing to evidence in the record that Sutter East Bay sent warnings to SEIU in 2004 concerning non-employee meetings on its premises. Second, Sutter East Bay contends that discriminatory intent is absent if the employer was unaware of the other meetings, and there was no evidence that Sutter East Bay was aware that SEIU or any other union conducted

meetings in its cafeteria. *See St. Luke's Mem. Hosp., Inc.*, 342 N.L.R.B. 1040, 1042 (2004) (finding an isolated instance of solicitation for personal business to be insufficient to demonstrate discriminatory enforcement because the employer was unaware of it); *Seton Co.*, 332 N.L.R.B. 979, 980 (2000) (declining to rely on incidents of solicitation and distribution not known to employer). Third, Sutter East Bay argues that to the extent that SEIU or any other union bargained for access to Medical Center property, it does not follow that NUHW would have the same access. *Cf. Seaboard Terminal & Refrigeration Co.*, 114 N.L.R.B. 754, 755 (1955). Finally, Sutter East Bay argues more broadly that no person or group may use an employer's property in a manner inconsistent with its intended purpose, *see S. Md. Hosp. Ctr.*, 293 N.L.R.B. 1209, 1216 (1989), and employees may not, as Griffith did, "commandeer" the dining area as a meeting space. Sutter East Bay contends that it was within its rights to adopt policies that protect patient care and foster a respectful workplace environment.

The Board responds that Sutter East Bay has no written policy prohibiting meetings in its cafeterias, and employees have held such meetings in the cafeterias for years. Indeed, the Board argues, Sutter East Bay's policies explicitly allow employee-to-employee solicitation and distribution in the cafeterias, so long as all employees involved are not on duty. In addition, at least one outside group, the California Nurses Association, meets there as well. Sutter East Bay cites to two isolated instances where it has prohibited non-employee SEIU representatives from holding meetings in the cafeteria, but, the Board argues, Sutter East Bay cannot show any time in past years when it prohibited any of the openly advertised employee meetings regularly held in the cafeterias. Under Board precedent, a hospital cannot prohibit employees from engaging in union solicitation and distribution in its cafeterias without showing that such activities would disrupt patient care. *See St. John's*

*Hosp.*, 222 N.L.R.B. at 1150–51; *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 495, 502 (1978). Here, the Board argues, Sutter East Bay made no attempt to show that solicitation in the cafeterias—which are used almost entirely by employees—would hinder patient care. Instead, as the ALJ found, Sutter East Bay changed its solicitation and distribution policy to hinder employees' support for NUHW. Sutter East Bay claims that it was concerned about disruptive meetings and table-hopping, but it could have proscribed that behavior directly instead of targeting solicitation and distribution generally.

**B.**

We deny Sutter East Bay's petition on this issue and grant the Board's cross-application for enforcement. Sutter East Bay makes essentially two arguments: First, it was unaware of past employee meetings and solicitations, and it attempted to stop events it was aware of in the past. Second, as the owner of the property and operator of the business, Sutter East Bay must be allowed to control what goes on in its facilities. The former argument is contradicted by the record and, in any event, is not essential to the Board's conclusion. The latter argument is a complaint against well-established case law preventing hospitals from banning solicitation in employee-focused cafeterias.

The Board properly found a violation of the Act without regard to whether Sutter East Bay knew of past group meetings in the cafeteria. As always, restrictions on employee solicitation during nonworking time in nonworking areas are presumptively invalid absent a showing of special circumstances. *Beth Israel Hosp.*, 437 U.S. at 492–93. In particular, while hospitals have the leeway to enact more stringent prohibitions in patient-care areas, that leeway requires that the "balance should be struck against the prohibition in areas other than immediate patient care

areas such as lounges and cafeterias." *Id.* at 495, 506–07. In *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773 (1979), for example, the Supreme Court held that the hospital properly justified its ban on solicitation in the corridors and sitting rooms on patient floors as necessary to prevent disruption of patient care, but also concluded that the hospital had not justified such a ban in the cafeteria because the facts showed that patients rarely visited the cafeteria. *Id.* at 786–87.

Here, the cafeteria was shown to be used almost exclusively by employees. Sutter East Bay did not even attempt to demonstrate any kind of special circumstances that would justify a ban on union solicitation there. Sutter East Bay argues that it was only trying to prevent a takeover of its cafeterias, but Bruce Hatten's admission that he ordered employees not to solicit or distribute goes further than just preventing disruption. Sutter East Bay complains in its brief that casinos and department stores have more power to prohibit employee solicitation in their cafeterias, but the Supreme Court already addressed and rejected such an argument in *Beth Israel Hospital*, citing the balance discussed above and the customer-facing function of cafeterias in other businesses. 437 U.S. at 505–07.

The Board's conclusion that Sutter East Bay changed its solicitation rules to squelch union activity in March 2009 is supported by substantial evidence. Hatten's instructions to the security guards display animus toward the "outside union," but more to the point is the fact that SEIU employees had been meeting in the cafeteria regularly. Hatten, in fact, admitted that he was "sure that SEIU stewards came into the cafeteria prior to the trusteeship, handed out flyers, and did other things to encourage support for SEIU." Board Decision at 6 n.8 (ALJ Op.). But when employees attempted to do the same for NUHW, Hatten took aggressive action to prevent it. That makes this case different than, for example, *St. Luke's Memorial*

*Hospital, Inc.*, where the Board refused to hold against the employer its lack of knowledge about an isolated incident of solicitation that had occurred contrary to its established policy. *See* 342 N.L.R.B. at 1042. As Hatten admitted, he knew of the SEIU solicitation and distribution, and Sutter East Bay had a policy generally allowing solicitation and distribution in its cafeterias, so long as employees were not on the clock.

Sutter East Bay claims that changing the solicitation policy was necessary to prevent disruptive meetings, but the record supports the ALJ's conclusion that such a concern only arose when the employees began meeting about the new union. Given Sutter East Bay's lack of any written policy prohibiting meetings in the cafeteria, its practice of allowing such employee-to-employee solicitation by SEIU stewards and others in the past, and its sudden about face in light of the effort to certify NUHW, the Board had substantial evidence on the record that Sutter East Bay unlawfully redefined its solicitation policy. We defer to that determination and grant the Board's cross-application for enforcement.

### III. Disciplinary Actions Against Beverly Griffith

We next consider the Board's determination that Sutter East Bay unlawfully discriminated against Beverly Griffith by disciplining her for the water-spilling incident, evicting her from the cafeteria on March 20 and 23, threatening to suspend her and suspending her on March 23, and terminating her after the March 24 confrontation. The Board adopted the ALJ's reasoning and conclusion that Sutter East Bay had unlawfully disciplined Griffith due to her support for the new union. Board Decision at 1 (Board Op.).

The ALJ purported to apply the test from *Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.

1981), which is followed when an employee is disciplined for a reason purportedly unrelated to any protected activity, such as a discharge for theft or poor performance. Under *Wright Line*, the Board's General Counsel must first show that the adverse employment action was motivated by the employee's participation in protected activities. If the General Counsel makes such a showing, the burden shifts to the employer to show that it would have taken the same action even without the unlawful motive. *See, e.g.*, *Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1141 (D.C. Cir. 2011); *Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1135 (D.C. Cir. 2003).

The ALJ rejected the General Counsel's suggestion that the test from *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964), would be appropriate as an alternative to *Wright Line*. *Burnup & Sims* analysis is employed when disciplinary action was taken based on conduct that occurred in the course of a protected activity. *Id.* at 23. Here, the ALJ specifically declined to apply *Burnup & Sims* to the water-spilling incident because spilling water is not a protected activity, Board Decision at 23 n.93 (ALJ Op.), and made no further findings or application of *Burnup & Sims* to any other issues. Two members of the Board, however, briefly noted that they would have upheld the ALJ's conclusion under *Burnup & Sims* as well as *Wright Line*. *Id.* at 2 (Board Op.).

**A.**

Sutter East Bay argues that the ALJ improperly applied the *Wright Line* test by failing to examine or even mention whether Bruce Hatten had a reasonable belief that Griffith had engaged in the misconduct. An employer who holds a good-faith belief that an employee engaged in the misconduct in question has met its burden under *Wright Line*. *See DTR Indus., Inc.*, 350 N.L.R.B. 1132, 1137 (2007). This is true even if the

employer is ultimately mistaken about whether the employee engaged in the misconduct. The good-faith belief demonstrates that the employer would have acted the same even absent the unlawful motive. *See id.*

Here, Sutter East Bay argues, the ALJ improperly focused on what actually happened rather than what Hatten reasonably believed. In doing so, the ALJ placed too high a burden on Sutter East Bay, requiring the hospital to show, for example, that Griffith spilled the water intentionally. Instead, Board and circuit precedents reject the notion that Hatten was obligated to investigate the water incident in any particular way, Sutter East Bay argues, and based on the report from McDuffie, the security report, and Griffith's past behavior, Hatten reasonably believed Griffith intentionally spilled the water. Likewise, Hatten had a reasonable belief, based on the information given to him by the security guards, that Griffith disrupted the cafeteria on March 23. Yet, Sutter East Bay argues, the ALJ did not even mention or evaluate Hatten's reasonable belief regarding the cafeteria disruption or Hatten's judgment that Griffith was being insubordinate in failing to vacate the cafeteria when ordered to do so. So too with the profane tirade on March 24: Hatten based his decision on reports from two supervisors that Griffith engaged in the profane tirade, and on Griffith's own admission that she might have used the profane language. With each of these incidents, Sutter East Bay contends, Hatten had reason to believe that Griffith engaged in the misconduct, and with each incident the ALJ failed to address that crucial point.

The Board provides only a brief response to Sutter East Bay's *Wright Line* argument. The Board asserts that a reasonable belief is not sufficient for an employer to meet its *Wright Line* burden, arguing that the employer must show not only that it had a reasonable belief but also that it acted based on

that belief instead of the improper motivation. *See Midnight Rose Hotel & Casino, Inc.*, 343 N.L.R.B. 1003, 1005 (2004). The Board contends that Sutter East Bay's failure to engage in even a cursory investigation of the water-spilling incident defeats any claim that Sutter East Bay actually believed the misconduct occurred or that it acted on that belief. With regard to the March 23 incident, the Board essentially argues that Sutter East Bay could not demonstrate a reasonable belief that Griffith engaged in the tablehopping, and indeed it did not happen. Hatten claims to have relied on Parks' report of the tablehopping, but, the Board contends, Parks testified only that he told Hatten that Griffith moved to one other table and then back to her own. *See* Board Decision at 15 (ALJ Op.). So too with regard to whether Griffith defied Hatten's orders on March 23. The Board argues that Griffith was not in fact defiant, and therefore Hatten would have no reasonable belief that she refused to follow his order to leave.

## B.

### 1.

The ALJ misapplied the *Wright Line* test. Unlike the ALJ's analysis, the *Wright Line* test does not concern itself with whether the employee actually engaged in the misconduct. Instead, proper application of *Wright Line* requires that the judge determine 1) whether the General Counsel has shown an improper motivation for the disciplinary action, and, if so, 2) whether the employer can demonstrate that it would have taken the same action even without the improper motivation. *See, e.g.*, *Shamrock Foods Co.*, 346 F.3d at 1135–36. In any case in which the evidence is disputed concerning the disciplined employee's underlying misconduct, it would seem essential that the trier of fact must determine whether the employer had a good faith belief in order to even begin an analysis of whether

the employer would have imposed the same consequence in the absence of the anti-union animus. Certainly that is true here. For all we can tell from the record and the ALJ's analysis, Sutter East Bay with no animus at all would have disciplined Griffith in precisely the same fashion if it believed she committed the misconduct. If Hatten reasonably believed that Griffith had spilled the water intentionally, for example, he presumably had the right to discipline her. So too if he reasonably believed that she refused to leave the premises on March 23 or that she engaged in the verbal tirade on March 24. If Sutter East Bay's management reasonably believed those actions occurred, and the disciplinary actions taken were consistent with the company's policies and practice, then Sutter East Bay could meet its burden under *Wright Line* regardless of what actually happened. Unfortunately, Sutter East Bay never had the chance to meet its *Wright Line* burden here because the ALJ declined to even examine what Hatten believed, whether his beliefs were reasonable, and whether his actions based on those beliefs were consistent with Sutter East Bay's policies and past practice.

On the water-spilling incident, the ALJ expressly invoked *Wright Line* as the proper standard and rejected *Burnup & Sims*. Board Decision at 23 & n.93 (ALJ Op.). The ALJ seemingly applied the first step of *Wright Line*, finding that Bruce Hatten had become aware of Griffith's activities in support of NUHW prior to the water-spilling incident and finding that Hatten favored SEIU and sought to quell support for NUHW. *Id.* at 23. But the ALJ's analysis of the second step of the *Wright Line* analysis is absent: the ALJ stated that he "[did] not believe Hatten ever conducted an investigation of the incident" and instead relied solely on the security report of the incident and McDuffie's statement to him on the phone. *Id.* at 24. For that reason, and seemingly based on the ALJ's general discrediting of Hatten's testimony, the ALJ concluded that Hatten issued the warning to Griffith in violation of the Act.

Nowhere in that analysis is there an examination of whether Hatten had a reasonable belief that Griffith intentionally spilled the water. Hatten's failure to investigate the matter in a specific way seems to be the foundation for the ALJ's conclusion, but an employer is not required to investigate in any particular manner, *Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 310 (D.C. Cir. 2006), especially when the Board can point to no evidence that would have been uncovered after a deeper investigation. Of course, none of this is to say whether Hatten reasonably believed that Griffith spilled the water—such a determination is to be made by the finder of fact, not by us. But the finder of fact must actually undertake to make that finding before pronouncing judgment under *Wright Line*.

The ALJ's analyses of the March 23 and 24 incidents are similarly deficient. Rather than applying the *Wright Line* test by examining Hatten's reasonable beliefs and how those beliefs might have informed his disciplinary decisions, the ALJ simply reached factual conclusions as to what actually happened. He found, for example, that Griffith did not use the word "f***" in the break room after being informed of her suspension on March 24. Board Decision at 30 (ALJ Op.). But Hatten, who was not present during the tirade, relied on reports from managers stating that Griffith *did* engage in the tirade, and on Griffith's own admission that she "might have" used that language. Whether the ALJ believes the reports are accurate or whether Griffith actually engaged in the tirade is largely immaterial to whether Hatten reasonably believed she did. The ALJ relied on his conclusion that the contemporaneous written reports were self-serving fabrications. *See* Board Decision at 30 n.101 (ALJ Op.). Of course, if Hatten were properly found to be part of such a fabrication or to have knowledge of it, that would relate directly to his reasonable belief. But the ALJ made no analysis or finding that Hatten had any reason to doubt the veracity of the

reports. Therefore, the proper question was whether Hatten, relying on those reports and Griffith's own admission, reasonably believed the tirade occurred.

Reviewing the ALJ's analysis, it is difficult to even surmise what legal standard he applied with regard to the March 23 and 24 events, given the total absence of any mooring to the *Wright Line* test or any other test. The ALJ's findings amount to this: the ALJ did not believe that Griffith engaged in the misconduct, and therefore he concluded that Sutter East Bay violated the Act by disciplining Griffith for it. The ALJ's conclusions leave that crucial second step of the *Wright Line* test unexamined and unanswered, and therefore we must vacate the factual record regarding the disciplinary measures in order to allow for the evidence to be reheard and subjected to the proper standard.

Perhaps out of concern that the ALJ's *Wright Line* analysis was defective, the Board made a terse statement that *Burnup & Sims* analysis would also support the ALJ's conclusion. Board Decision at 2 (Board Op.). Such a bare statement simply cannot survive judicial scrutiny. To receive our deference, an agency's decision must be supported by substantial evidence on the record and the agency must not act arbitrarily in applying established law to the factual evidence. *See, e.g.*, *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1346 (D.C. Cir. 2008). Here, the Board did not explain its reasoning when it noted—almost in passing—that *Burnup & Sims* analysis would sustain the ALJ's conclusions. The ALJ explicitly refused to apply *Burnup & Sims* to the water incident and did not mention it with regard to the other incidents. Board Decision at 23 n.93 (ALJ Op.). The Board does not meet its analytical burden by simply stating that application of *Burnup & Sims* would reach the same conclusion without providing any analysis or explanation. In so holding, we do not decide which

test, *Wright Line* or *Burnup & Sims*, is the correct test for analyzing each of these events. Griffith may or may not have been engaging in protected activities during the different incidents. Regardless, the Board did not properly apply any test at all.

**2.**

We cannot conclude without discussing another troubling aspect of this case. As the Supreme Court has explained, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998). Yet the ALJ treated conflicting evidence here with an almost breathtaking lack of evenhandedness. The employer's witnesses saw their testimony completely disregarded for the slightest of immaterial inconsistencies, while the union's witnesses survived even material contradictions.

One illustrative example is the ALJ's weighing of the testimony regarding the profane tirade on March 24. During Aquino's testimony about the tirade, Aquino originally quoted Griffith and included the profanity she purportedly used; later in his testimony, while discussing matters related to the sequence of events and not the language, he quoted Griffith in almost the same terms, but without the profanity. Upon inquiry from the ALJ, Aquino made clear that Griffith did, in fact, use the profane words. *See* Board Decision at 18–19 n.76 (ALJ Op.). Despite crediting Aquino as appearing to testify honestly, the ALJ rejected Aquino's account of the incident largely based on this inconsistency. *Id.* at 21. As should be obvious, however, a witness might feel reluctant to use obscene language unnecessarily on the witness stand. Dismissing as contradictory such clearly consistent testimony tries both our deference and

our patience, especially given the ALJ's willingness to countenance Griffith's significant reversal as to whether she used the word "f***" during the tirade. Griffith admitted to Hatten on March 26 that she might have used the word "f***." *Id.* at 20. She fully denied during the hearing that she used that word at all. *Id.* at 18. The treatment of Aquino's testimony compared to Griffith's is but one example of the problem that troubles us.

Although an ALJ's credibility determinations are entitled to significant deference, *e.g.*, *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998), they are not immune to judicial scrutiny. Because we are already vacating the factual record due to the misapplication of *Wright Line* test, we lack the occasion here to resolve whether the ALJ achieved the rare result of exceeding our deference. We note with great concern, however, the apparent application of different standards to union and company witnesses. We hope that concern will be alleviated on remand.

## IV. Conclusion

We grant the Board's cross-application for enforcement of its order only to the extent that it concludes that Sutter East Bay violated the Act with its unlawful surveillance of union activities and redefinition of its solicitation and distribution policies. We cannot do so, however, regarding the disciplinary actions taken against employee Beverly Griffith. The Board adopted the ALJ's fatally deficient application of the *Wright Line* standard, and we therefore grant Sutter East Bay's petition for review and vacate the Board's factual record and conclusions as to that issue. On remand, the Board must rehear the evidence and correctly apply the appropriate legal standards. In doing so, the Board and the ALJ must take care to "draw all those inferences that the evidence fairly demands"—no more and no

less.  *Allentown Mack Sales & Serv., Inc.*, 522 U.S. at 378.  That requirement is the "foundation of all honest and legitimate adjudication."  *Id.* at 379.

*So ordered.*