# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 9, 2016          Decided April 12, 2016

No. 14-1263

FORT DEARBORN COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

DISTRICT COUNCIL 4, GRAPHIC COMMUNICATIONS
CONFERENCE OF THE INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
INTERVENOR

---

Consolidated with 15-1007

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*Richard L. Marcus* argued the cause and filed the briefs for petitioner.

*Valerie L. Collins*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H.*

*Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

*Thomas D. Allison*, *Jr.* and *N. Elizabeth Reynolds* were on the brief for intervenor District Council Four, Graphic Communications Conference of the International Brotherhood of Teamsters in support of respondent.

Before: HENDERSON, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In 2010, Fort Dearborn Company suspended and then fired an employee who was also a chief steward for District Council Four, Graphic Communications Conference of the International Brotherhood of Teamsters. Just weeks earlier, during collective bargaining negotiations, a manager had threatened to scrutinize closely and find a reason to fire the employee. The National Labor Relations Board found that the threat placed the Company in violation of section 8(a)(1) of the National Labor Relations Act. The Board also found that the Company violated sections 8(a)(3) and 8(a)(1) of the Act when it suspended and fired the employee, purportedly for bringing an unauthorized visitor into one of its label printing plants and for not cooperating fully during a subsequent investigation. The Company petitions for review.

Although the Company challenges the Board's findings and conclusions, its principal contention is that the Board misapplied the test in *Wright Line*, 251 N.L.R.B. 1083 (1980), as articulated in *Sutter East Bay Hospitals v. NLRB*, 687 F.3d 424 (D.C. Cir. 2012). The Board, the Company maintains, failed to consider evidence of the Company's good-faith belief in the existence of

circumstances that would have justified the suspension and termination of the employee. *Sutter East Bay* is unhelpful to the Company, however, because evidence of an employer's good-faith belief suffices to meet the employer's burden under *Wright Line* only if the employer acts on that belief as it normally would. Here, substantial evidence in the record supports the Board's finding that the reasons given for suspending and firing the employee were pretextual because the Company's conduct was not consistent with its policy and past practice. Accordingly, as the Company's other challenges to the Board's decision are unpersuasive, we deny the petition and grant the Board's cross-application for enforcement of its order.

## I.

The Fort Dearborn Company operates 10 manufacturing plants in the United States and Canada, which print labels for cans and plastic bottles. The events at issue occurred at its plant in Niles, Illinois ("the Plant"). Incorporated into the Plant's label-making process are several proprietary techniques that the Company considers trade secrets, and the Company asks its employees to sign a confidentiality agreement. In addition, according to the Company, it has a policy against allowing unauthorized visitors into the Plant. During the "second shift," which runs from 3 p.m. to 11 p.m., however, the Company took no steps to enforce these policies or shield its proprietary techniques from the eyes of non-employees. According to three employees who worked that shift, food deliverymen, truck drivers, the family members of employees, and former employees often walked through the Plant during the evening shift.

Prior to his termination, Marcus Hedger had worked at the Plant for nine years, most recently as a second pressman installing plates on a printing press and monitoring printing runs.

For six and a half years, Hedger also served as a union steward, becoming chief steward for two of the Plant's three bargaining units — the Bindery, Shipping, and Sheeting Unit and the Lithography Unit. His union duties included negotiating collective-bargaining agreements with Company management as a member of the union's bargaining committee. For most of his tenure with the Company, Hedger maintained an exemplary disciplinary record, accruing only a single verbal warning for tardiness. Then, in June 2010, Hedger's relations with management took a turn for the worse.

During union-management negotiations over a new collective-bargaining agreement, the union membership, on its bargaining committee's recommendation, rejected management's contract proposal. At the first meeting after that vote, on June 4, 2010, tension arose between management and the bargaining committee. After accusing the union of misconduct relating to use of a copying machine and leafleting in the Plant parking lot, the Company's senior vice president for operations, William Johnstone, issued a "watch, catch, fire" threat to Hedger, promising to subject his work to closer scrutiny in an effort to catch him committing an offense that would justify the termination of his employment. Hedger filed a union grievance protesting the threat.

Just over two months later, on August 12, 2010, Peter Schmidt, a union member and printer by trade, turned up at the Plant with his bicycle during the "second shift." Schmidt asked for Hedger, who at 8:40 p.m. left his work station to meet him. Hedger then walked with Schmidt through the Plant and, at 8:51 p.m., saw him out, an exit captured by a Plant security camera. After management viewed the security camera footage, the Plant manager, Robert Kester, initiated an internal investigation of the bicycle incident. On August 18, Kester and two other management officials interviewed Hedger. In response to

management's questions about the incident, Hedger said he did not recall anything about those events, and afterward he was suspended with pay. On August 23, Kester and another manager interviewed Hedger again. This time Hedger answered most of management's questions but at the instruction of his union representative, he declined to give Schmidt's name. Hedger did say that he and the bicyclist were together in the Plant for only a matter of minutes. During management's interview on August 30, another Plant employee, Robert Schmitt, who was working the "second shift" on August 12, said that Hedger and Schmidt were together for 10 to 15 minutes at most. By letter of September 7, 2010, the Company informed Hedger that he was being fired because he "brought an unauthorized person into the plant on August 12, 2010," and he "did not respond truthfully to the Company's questions regarding events on that date of which [he] w[as] fully aware."

The union filed an unfair labor practice charge with the Board. After an evidentiary hearing, the Administrative Law Judge ("ALJ") ruled that Hedger's termination violated Sections 8(a)(3) and 8(a)(1) of the Act, but that the June 4 threat and Hedger's suspension did not violate the Act. ALJ Decision ("ALJ Dec.") at 3–11 (Nov. 30, 2011). The Board agreed with the ALJ's conclusion about Hedger's termination, but otherwise reversed, finding that the June 4 threat violated Section 8(a)(1) of the Act and in light of that threat that Hedger's suspension violated Sections 8(a)(3) and 8(a)(1). *Fort Dearborn Co.* ("2012 Decision"), 359 N.L.R.B. No. 11 (2012). After the appointments of two Board Members were invalidated, *see NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), a new three-Member Board, upon *de novo* review, adopted the 2012 Decision, *Fort Dearborn Co.* ("2014 Decision"), 361 N.L.R.B. No. 109 (2014), with one Member concurring, *id.* at *2 (Member Miscimarra concurring). The Company petitions for review.

6

## II.

Section 8(a)(1) provides that it is "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the Act]." 29 U.S.C. § 158(a)(1). Section 7 grants employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. An employer violates Section 8(a)(1) when its statement to an employee, "considering the totality of the circumstances, . . . has a reasonable tendency to coerce or to interfere with those rights." *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001); *see also Dover Energy, Inc. v. NLRB*, No. 14-1197, 2016 WL 1104732, at *4 (D.C. Cir. Mar. 22, 2016). "Section 8(a)(1) prohibits coercive statements that threaten employees with job loss . . . in retaliation for protected union activities." *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 544 (D.C. Cir. 2006). Under Board precedent, threats to subject employees to closer scrutiny because of union activity also violate Section 8(a)(1). *See Oldfield Tire Sales*, 221 N.L.R.B. 1275, 1276 (1975).

Section 8(a)(3) provides that it is "an unfair labor practice for an employer . . . by discrimination in regard to . . . tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Discharge of a worker because of union activity violates Section 8(a)(3), *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983), and "a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1)," *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983). Where the employer purports to have disciplined the employee for reasons unrelated to protected Section 7 conduct, the Board applies the test in *Wright Line*, 251

N.L.R.B. at 1089. *See Transp. Mgmt.*, 462 U.S. at 394–95. First, the General Counsel must "make a prima facie showing sufficient to support the inference that protected [i.e., union-related] conduct was a motivating factor" behind the discipline. *Tasty Baking*, 254 F.3d at 125 (alteration in original) (quoting *TIC-The Indus. Co. Se. v. NLRB*, 126 F.3d 334, 337 (D.C. Cir. 1997)). Relevant factors include "the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action." *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 735 (D.C. Cir. 2000) (quoting *Power, Inc. v. NLRB*, 40 F.3d 409, 418 (D.C. Cir. 1994)). Second, "[o]nce a prima facie case has been established, the burden [of persuasion] shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (second alteration in original) (quoting *Tasty Baking*, 254 F.3d at 126).

The court will uphold the Board's findings so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). Under the substantial evidence standard, "the Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (quoting *Bally's Park Place*, 646 F.3d at 935). Our review of the Board's conclusions as to discriminatory motive is even more deferential, "because most evidence of motive is circumstantial." *Id.* (quoting *Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000)). The court accepts the ALJ's credibility determinations as adopted by the Board, "unless they are patently insupportable." *Tasty Baking*, 254 F.3d at 124 (quoting *Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 265 (D.C. Cir. 1993)). Where the Board disagrees with the ALJ, our standard of review remains unchanged. *Local 702, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 215 F.3d 11, 15 (D.C. Cir.

2000). The Board is free to disagree with the ALJ, but it must explain the basis of its disagreement. *Id.*

## A.

The Board found that Johnstone's threat during the June 4 collective bargaining negotiations to watch, catch, and fire Hedger constituted a Section 8(a)(1) violation. Although Johnstone and Kester, the management representatives at the June 4 bargaining session, denied that Johnstone threatened Hedger, the ALJ credited the contrary testimony of Hedger and David Ishac, a Plant employee and union member present at the session. The ALJ gave particular weight to Ishac's version of events because Ishac testified adversely to the Company for which he still worked at the time. Nevertheless, the ALJ found no Section 8(a)(1) violation because the record left unclear whether Johnstone meant he would catch and fire Hedger for activity protected by the Act or for unprotected activity. ALJ Dec. at 3. The Board did not disturb the ALJ's credibility determinations, but it disagreed with his legal analysis. In the Board's view, the ALJ "missed the point." 2012 Decision, 359 N.L.R.B. No. 11 at *1. Where the ALJ relied on Johnstone's subjective motivation, the Board noted, he should instead have considered, from an objective vantage, the effect of Johnstone's threat on the employee. *Id.* (citing *Am. Freightways Co.*, 124 N.L.R.B. 146, 147 (1959)). Applying the proper standard, the Board found that "Johnstone appeared to" threaten Hedger "*because* of his protected union activity" and so the threat "tended to interfere with Hedger's exercise of his Section 7 rights." *Id.* (emphasis in original).

Substantial evidence supports the Board's finding. Johnstone uttered the threat at the first bargaining session after the union membership had rejected management's proposal for a new collective-bargaining agreement. Ishac testified that "Johnston[e] was very upset" about the union membership's

vote. ALJ Hr'g Tr. at 98 (Oct. 13–14, 2011). Johnstone, for his part, admitted that he was "frustrated" at the bargaining session. *Id.* at 348, 351–53. According to Hedger and Ishac, during the June 4 session, Johnstone accused the union of malfeasance for misusing the Plant's photocopier and illegally placing flyers on car windshields in the Plant parking lot. In addition, Hedger testified that Johnstone objected to the union "circus," *id.* at 30, 374–75, and, according to Hedger, either shortly before or shortly after the "circus" comment, Johnstone told him: "[W]e're watching you, Marcus, and we're going to catch you and we're going to fire you and many people are going to laugh at you." *Id.* at 30; *see also id.* at 374–75. Hedger testified his contemporaneous notes of the June 4 bargaining session recorded the words "Watching you — fired." *Id.* at 374. Ishac's testimony was to the same effect. He testified that, after accusing the union of misconduct, Johnstone told Hedger: "[W]e are watching you, we're going to catch you, we will fire you and 70 people will be laughing at you." *Id.* at 99. This evidence supports the Board's finding that, in view of the context and timing, a reasonable employee in Hedger's position would have understood Johnstone to be threatening him in retaliation for his role in the collective-bargaining process.

The Company's challenges to the Board's Section 8(a)(1) determination lack merit. First, the Company maintains that the Board improperly relied on Hedger's union "circus" testimony because the ALJ did not mention it. But "the Board is the agency entrusted by Congress with the responsibility for making findings under [the Act]," *Local 702*, 215 F.3d at 15 (quoting *Carpenters Local No. 33 v. NLRB*, 873 F.2d 316, 319 (D.C. Cir. 1989)), and it is not restricted to the evidence cited by the ALJ. Nothing in the ALJ's decision suggests that he disbelieved Hedger's "circus" testimony. To the contrary, the ALJ generally credited Hedger's account of the June 4 negotiations over management's. Second, nor does it matter whether Hedger's

protected activity was "the source of [Johnstone's] frustration." Pet'r's Br. 21. The Company, like the ALJ, focuses on the wrong facts as it is not the subjective motivation of the speaker that matters but the statement's effect, viewed objectively, on the listener. *See Dover Energy*, 2016 WL 1104732, at *4. Third, the answer to the Company's question — "What Section 7 rights did Johnstone's statement 'reasonably tend to interfere with'?" Pet'r's Br. 22 — lies in the Board's emphasis on the context and timing of the threat. Johnstone issued the threat during a contentious round of collective bargaining shortly after union bargainers — including Hedger — had successfully urged its membership to reject management's proposal. *See* 2012 Decision, 359 N.L.R.B. No. 11 at *1. Collective bargaining falls well within the ambit of Section 7 protected activity. *See* 29 U.S.C. § 157.

## B.

With respect to Hedger's suspension and firing, the Company maintains chiefly that the Board's application of the test established in *Wright Line*, 251 N.L.R.B. 1083, was flawed because the Board ignored evidence supporting Company management's good-faith belief in facts justifying the discipline it meted out. It necessarily follows under this court's application of *Wright Line* in *Sutter East Bay*, 687 F.3d at 434–37, the Company maintains, that it did not violate Sections 8(a)(3) and 8(a)(l). Although the court will defer to the Board's interpretation of the Act, *Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 337 (D.C. Cir. 2003), an unexplained divergence from its precedent would render a Board decision arbitrary and capricious, *see Teamsters Local Union Nos. 822 & 592 v. NLRB*, 956 F.2d 317, 320 (D.C. Cir. 1992). Neither the *Sutter East Bay* argument nor the Company's other contentions, however, demonstrate Board error or adjudication inconsistent with *Wright Line*.

The Board's threshold objection that the Company's good-faith-belief argument is not properly before the court because it was not presented to the Board, *see* 29 U.S.C. § 160(e), is not well taken. Even though the Company's exceptions to the ALJ's decision do not clearly raise the good-faith issue, *see* Resp't's Exceptions at 2, 6 (Jan. 11, 2012), at times "'vague exception[s]' to an ALJ's finding may be sufficient 'to preserve an issue for appeal when [the] petitioner's brief in support of its exceptions adequately puts the Board on notice' of the grounds on which the petitioner is objecting." *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 372 (D.C. Cir. 2016) (quoting *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 417–18 (D.C. Cir. 1996)). That is true here. In its supporting brief to the Board, the Company argued that its managers reasonably believed that Hedger may have compromised confidential company information by walking Schmidt through the Plant for upwards of an hour. *See* Resp't's Br. in Support of Exceptions at 18–19, 21 (Jan. 11, 2012). The Company raised the issue more explicitly in other briefs to the Board: "The Company did not and does not claim that Hedger was discharged because he *actually* spent 50 minutes to an hour with Schmidt on the evening of August 12, 2010. He was discharged because of what [the Company] *believed* took place on August 12 . . . ." Resp't's Reply to Charging Party's Br. in Opp'n to Resp't's Exceptions at 7 (Feb. 22, 2012) (emphasis in original); *see also* Resp't's Br. in Reply to Acting Gen. Counsel's Answering Br. at 5 (Feb. 22, 2012). Taken together, the Company's submissions to the Board adequately raised the good-faith issue, and the court has jurisdiction to consider these challenges. *See DHL Express*, 813 F.3d at 372.

The Board concluded that the Company violated Sections 8(a)(3) and 8(a)(1) by suspending and firing Hedger, in part reversing the ALJ, who had found that the suspension did not violate the Act. The Board explained its reversal: the suspension constituted an unfair labor practice "[i]nasmuch as the

suspension was one of the steps taken" by the Company to unlawfully fire Hedger. 2012 Decision, 359 N.L.R.B. No. 11 at *2. In affirming the ALJ's decision that Hedger's termination violated the Act, the Board relied on the ALJ's factual findings, although not all of them. On *Wright Line*'s first step, the Board described some found facts as "unnecessary" to its decision and explained that "[i]n affirming the [ALJ's] finding" that Hedger's firing was motivated by anti-union animus, it "additionally rel[ied] on" Johnstone's June 4 threat to "watch, catch, and fire" Hedger for his union activity. *Id.* at *2 n.5. On the second step of *Wright Line*, the Board affirmed the ALJ's finding that the Company's first reason for firing Hedger — his walk with Schmidt through the Plant — was pretextual, adopting "the reasons given by the [ALJ]." *Id.* Likewise, the Board affirmed the ALJ's finding that the Company's second reason for firing Hedger — his failure to cooperate fully during August 18 and 23 interviews — was pretextual, emphasizing that the Company took no disciplinary action against other employees who refused to cooperate with the investigation into the August 12 incident. The Board declined to rely on two grounds on which the ALJ based his pretext findings, but the remaining evidence amply supports the Board's determination that the Company's stated reasons for firing Hedger were pretextual.

Substantial evidence supports the Board's determination, on *Wright Line*'s first step, that the General Counsel established a *prima facie* case that Hedger's union activity was a motivating factor in his suspension and termination. The Company does not dispute that Hedger served as a chief union steward and a member of the union's bargaining committee or that management knew this. There is ample record evidence that Johnstone issued the "watch, catch, and fire" threat to Hedger, and the Board was entitled to draw an inference of anti-union motivation from that threat. *See Vincent Indus.*, 209 F.3d at 735. Further, Johnstone's threat is not the only evidence of anti-union

animus on which the Board relied.  The Company's insistence to the contrary overlooks the Board's statement that it was "affirming the [ALJ's] finding" as to *Wright Line*'s first step, save for the ALJ's reliance on enumerated pieces of evidence the Board found "unnecessary" to its decision.  2012 Decision, 359 N.L.R.B. No. 11 at *2 n.5.  By setting aside that "unnecessary" evidence, the Board did not eliminate "all of the findings of animus made by the ALJ," Reply Br. 12, because it adopted the ALJ's reliance on evidence that the Company provided pretextual reasons for firing Hedger.

A finding of pretext may support an inference of unlawful motive, *see Pioneer Hotel, Inc. v. NLRB*, 182 F.3d 939, 947–48 (D.C. Cir. 1999); *Citizens Inv. Servs. Corp.*, 342 N.L.R.B. 316, 330 (2004), and it does so here.  Testimony before the ALJ established that prior to Hedger's suspension and firing, the Company had never taken steps to enforce its confidentiality policy or its policy against unauthorized visitors on the "second shift," when the Plant's doors were often open and there was no way to sign in at the front desk.  Further, Kester testified that the Company had a progressive discipline policy, yet, for unexplained reasons, the Company failed to apply that policy to Hedger, despite what Kester described as Hedger's "very good" nine-year record of only one verbal warning for tardiness.  ALJ Hr'g Tr. at 262–63.  And Hedger faced disparate treatment. Kester and Ishac testified that after Hedger was fired, two employees who allowed a former employee into the Plant each received a one-day suspension.

Substantial evidence also supports the Board's determination, on *Wright Line*'s second step, that the Company failed to show that it would have suspended and fired Hedger regardless of anti-union animus.  In addition to the evidence that it did not enforce its confidentiality or visitor policy on the "second shift" and failed to explain why it did not follow its

progressive discipline policy, the Company's stated reasons for firing Hedger were undermined by evidence that food deliverymen, truck drivers, employees' family members, and former employees regularly entered the Plant during the "second shift." Indeed, Kester acknowledged that prior to Hedger's suspension and termination, the Company had never disciplined an employee for allowing a non-employee into the Plant. Similarly, the Board noted that the Company did not discipline employees besides Hedger who failed to cooperate with its investigation into the events of August 12. Kester testified that several of the employees he approached as part of his investigation "clearly didn't want to get involved," ALJ Hr'g Tr. at 178, and so, for example, he had not interviewed Tony Sass, who was working on the same press as Hedger on August 12, because Sass "said that he did not want to get involved," *id.* at 246–47. There is no record evidence any of these other employees were subject to discipline for failure to cooperate with the investigation.

Upholding the Board's findings and conclusions is consistent with our precedent. The court has upheld Board determinations that employers have violated Sections 8(a)(3) and 8(a)(1) on facts similar to those present here. *See, e.g.*, *Inova Health Sys.*, 795 F.3d at 84–85; *Bally's Park Place*, 646 F.3d at 936–39; *Tasty Baking*, 254 F.3d at 126–27; *Parsippany Hotel*, 99 F.3d at 425. The Company's challenges to the Board's *Wright Line* analysis are unpersuasive.

The Company's principal contention relies on this court's opinion in *Sutter East Bay*, 687 F.3d 424. In that case, the court noted that, when assessing an employer's disciplinary action, the *Wright Line* inquiry asks not what an employee actually did but what the employer in good faith believed the employee did. *Sutter E. Bay*, 687 F.3d at 435. The Company maintains that the ALJ and the Board failed to evaluate whether its managers held

a good-faith belief in the existence of five facts that would have justified suspending and firing Hedger: (1) Hedger left his work station at a crucial moment, the start of "wash-up" after finishing a production run around 7:45 p.m.; (2) Hedger and Schmidt were in the Plant for about an hour; (3) Hedger did not have permission to leave his work station or escort Schmidt through the Plant; (4) Hedger's "guided tour" could have compromised confidential company information; and (5) Hedger lied during the August 23, 2010, interview with management. Pet'r's Br. 26, 30–31. But the Company has overlooked a key component of *Sutter East Bay*'s gloss on the *Wright Line* test. Whether an employer's disciplinary action was justified turns on what the employer "believed, whether [the] beliefs were reasonable, *and whether [its] actions based on those beliefs were consistent with [its] policies and past practice*." *Sutter E. Bay*, 687 F.3d at 436 (emphasis added). That is, an employer meets its burden to rebut the General Counsel's *prima facie* case of anti-union motive only if it can show that it parceled out discipline as it normally would when confronted with the same kind of employee misconduct that its managers reasonably believed had occurred. *See id.* at 435–37. A good-faith belief, therefore, is of little aid to an employer where the discipline imposed by the company departs from its policy or practice.

Here, the Board found that the Company acted in a manner not consistent with its policies and past practices, and as discussed, substantial evidence supports this finding. The Company inexplicably did not apply its progressive discipline policy to Hedger. Before suspending and firing Hedger, the evidence showed, the Company had never taken steps to enforce its confidentiality or visitor policies on the "second shift." Neither did the Company discipline employees who violated those policies as harshly as it punished Hedger. Nor did it punish employees who, like Hedger, declined to cooperate fully with the investigation into the events of August 12. So even if

the Company's managers had believed in good faith what it claims they believed, *Sutter East Bay* provides it no safe harbor.

The Company's other challenges to the Board's findings of anti-union motive and pretext merely reflect the Company's preferred interpretation of the record evidence and do not demonstrate the Board lacked substantial evidence to support its findings. "[W]e may not reject [the Board's findings] simply because other reasonable inferences may also be drawn." *Tasty Baking*, 254 F.3d at 125. To the extent the Company maintains that the lies Hedger told at the August 18 interview justify suspending him, this is non-responsive to the Board's conclusion that the suspension violated Sections 8(a)(3) and 8(a)(1) of the Act "[i]nasmuch as the suspension was one of the steps taken as part of the [Company's] unlawfully motivated efforts to discharge Hedger." 2012 Decision, 359 N.L.R.B. No. 11 at *2. Even if suspension alone was warranted, it is the suspension's place in the context of the Company's overall efforts to fire Hedger that renders it an unfair labor practice. *See Beverly Calif. Corp.*, 326 N.L.R.B. 153, 154 (1998), *enf'd in relevant part*, 227 F.3d 817, 838–39 (7th Cir. 2000).

Accordingly, we deny the Company's petition and grant the Board's cross-application for enforcement of its 2014 Decision and Order.