# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued February 5, 2015　　　　Decided August 18, 2015

No. 14-1101

HEALTHBRIDGE MANAGEMENT, LLC, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

————

Consolidated with 14-1116

————

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

————

*Erin E. Murphy* argued the cause for petitioners. With her on the briefs were *Paul D. Clement* and *William R. Levi*.

*Jared D. Cantor*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Associate, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney.

Before: HENDERSON, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* HENDERSON.

WILKINS, *Circuit Judge*: This case arises out of a labor dispute at six nursing homes in Connecticut operated by Petitioner HealthBridge Management. After a regional office of the National Labor Relations Board issued a complaint against HealthBridge alleging that it unfairly terminated housekeeping employees, the union that represents employees at the nursing homes distributed stickers and flyers asserting that HealthBridge had been "busted" for "violating federal labor law." Employees posted the notices on union bulletin boards, and some wore the stickers in various areas of the nursing homes where they worked. HealthBridge took down the flyers and ordered its workers to remove the stickers while working in patient care areas. The Board concluded that the company's conduct violated section 8(1)(a) of the National Labor Relations Act. HealthBridge petitioned for review of the Board's order, and the Board petitioned for enforcement. For the reasons discussed below, we deny the petition for review and grant the cross-application for enforcement.

## I.

Petitioners in this case are HealthBridge Management, LLC ("HealthBridge") and six long-term nursing care centers the firm operates in Connecticut (the "Centers"). The Centers provide convalescent and long-term nursing care and cater to primarily elderly residents. The New England Health Care Employees Union, District 1199, SEIU, AFL-CIO (the

"Union") serves as the exclusive bargaining unit for non-managerial healthcare employees at the six Centers.

HealthBridge and the Centers have historically permitted employees to wear Union insignia at all times in both patient care and non-patient care areas. *See Healthbridge Mgmt., LLC*, 360 N.L.R.B. No. 118, 2014 WL 2194550, at *7 (May 22, 2014). Collective bargaining agreements (the "Agreements") between the Union and the Centers provide that the Centers must make bulletin boards available for the display of "proper Union notices" in "a location conspicuous and accessible to workers." *E.g.*, J.A. 1117 (Art. 6(D)).

In March 2011, when the events that gave rise to this case occurred, HealthBridge and the Union were engaged in a contentious renegotiation of the Agreements, which were set to expire March 16, 2011. Shortly before that date, HealthBridge sent a series of letters to residents of the Centers and their families informing them of its side of the dispute. HealthBridge told residents that the healthcare industry was rapidly changing, and that in order to compete with lower-cost providers, it must make changes to the Agreements, since its prior bargain with the Union was "simply no longer sustainable." J.A. 1073-77. The letters described the Union as an intractable negotiating partner with a "'take-it-or-leave-it' approach," and warned that the Union had threatened to call a strike if it did not get what it wanted. J.A. 1078-81. HealthBridge told its residents and their families that the Union "ha[d] a long history" of calling strikes, but that it had a contingency plan to continue services uninterrupted by hiring replacement employees if the current nursing staff went on strike. J.A. 1073-77.

On March 21, 2011, the Board's Region 34 filed a complaint against HealthBridge alleging that three of the

Centers discharged or threatened certain housekeeping employees in violation of the National Labor Relations Act (the "Act" or "NLRA"). Four days later, the Union distributed stickers to employees at each of the Centers declaring – in a message superimposed over a black-and-white image of a gavel – that the Centers had been "BUSTED March 21, 2011 By National Labor Board For Violating Federal Labor Law." J.A. 1029, 1050. The Union also posted flyers on Union bulletin boards at the Centers stating that HealthBridge had been "BUSTED" and that the company "will do ANYTHING—even violate labor law—in [its] ruthless pursuit of more profit." J.A. 1062-67. The flyers advised readers that "[o]n March 21st, the National Labor Relations Board issued an 18-page federal complaint against [HealthBridge] for massive violations of federal law" and asserted that HealthBridge was trying to provoke a strike by "refusing to sign a contract extension like most other nursing home operators" and was "exploiting the elderly and their caregivers by lying, cheating and even law-breaking." *Id.*

Lisa Crutchfield, HealthBridge's Senior Vice President of Labor Relations, held a conference call that day with managers at the Centers instructing them to prohibit employees from wearing the stickers when working in resident-care areas or providing care to residents. She told managers to ask employees who refused to observe the policy to punch their time-cards out and leave the premises. At two Centers, management banned employees from wearing the stickers in *any* area of the facility, including non-patient care areas. *Healthbridge,* 2014 WL 2194550, at *7. Crutchfield also instructed managers at the Centers to remove the flyers from the bulletin boards. A week later, HealthBridge sent additional letters to residents and their families, informing them about the flyers, which it said were "full of misleading and false statements . . . designed to try and harm the

reputation of our Center in the community." J.A. 1083-85. The letters set forth HealthBridge's position on the "completely baseless" allegations in the Board's March 21 complaint, explained that there had not yet been any hearing or ruling in the case, and declared that HealthBridge planned to mount a robust defense. *Id.*

The Union filed charges with the Board concerning the sticker ban and flyer removals. The Board subsequently filed complaints alleging that HealthBridge's actions "interfer[ed] with, restrain[ed], and coerc[ed HealthBridge's] employees in the exercise of" their right to collective bargaining under section 7 of the Act, 29 U.S.C. § 157, in violation of section 8(a)(1) of the Act, *id.* § 158(a)(1). J.A. 32.

At a hearing before an ALJ, Crutchfield testified that she ordered the stickers banned from patient care areas out of concern for residents, who might think HealthBridge had committed a crime that could impact resident care.[1] J.A. 799-

---

[1] Specifically, Crutchfield averred:

> My concern was that if a resident was being cared for by somebody wearing this sticker it may cause confusion. The resident may not understand what – the sticker itself says busted with a judge's gavel. And it's saying that the center was busted. It suggests some kind of crime. I was concerned that residents would think – would not understand this was related to a labor matter and might be concerned for a larger issue. What is happening here at this center? Has this center been convicted of a crime? Is that impacting the care that I'm receiving? So my concern was that residents may be upset by this, may not understand it and it may create confusion and disruption for them.

J.A. 799-800.

800. HealthBridge also produced an expert on geriatric nursing care, Dr. Ilene Warner-Maron, who testified that the "busted" sticker could have posed a risk to the emotional wellbeing of vulnerable nursing home residents dependent on staff to render care. She testified that the word "busted" has a negative connotation that suggests arrest or bankruptcy, and that seeing the word, printed in red lettering on a sticker worn by their caregivers, could cause residents to become "agitated, upset, worried, [or] concerned." J.A. 721. Warner-Maron also told the ALJ that the sticker's statement that the Centers had violated the law could lead residents to fear that their nursing home would be closed, and they would be transferred to a new facility, an assertion she believed could be a form of emotional abuse. She admitted, however, that she did not speak with any residents, family members, or caregivers at any of the Centers in forming her opinion.

Crutchfield testified that she ordered the flyers removed because she did not consider them "proper" within the meaning of the Agreement provision permitting the Union's use of bulletin boards. She found them improper because they were "disparaging," "derogatory," and "defamatory" toward HealthBridge and falsely suggested that HealthBridge did not care about its residents or employees.[2] J.A. 774, 778. Crutchfield had previously asked her subordinates to remove other notices, including flyers stating that HealthBridge had robbed employees of vacation time, had "kick[ed employees] out the door," J.A. 810-11, would "[t]ake away every single thing we've fought for," and would "turn our nursing home into a sweatshop," J.A. 1055-60. Other notices Crutchfield removed included postings updating Union members on

---

[2] Asked for examples of a "proper" notice, Crutchfield listed those informing Union members about the date and time of meetings, contract negotiations, and other Union-related events.

changes HealthBridge sought to the terms of the Agreements. She did not communicate with or seek to inform anyone in the Union before removing the flyers. Crutchfield acknowledged that the Agreements did not expressly authorize HealthBridge to remove Union notices from the bulletin boards.

The ALJ determined that HealthBridge violated section 8(a)(1) of the Act by removing the flyers and banning the stickers from patient care areas at the six Centers (as well as non-patient areas at two of the Centers). A three-member panel of the Board voted unanimously to uphold the charges against HealthBridge related to the flyer removal, but split two-to-one in favor of the Union on whether the sticker ban contravened the Act. The Board determined that the prohibition on the stickers was presumptively invalid and could only be overcome by a showing of special circumstances, endorsing the ALJ's view of the case.[3] The Board said it did not require "actual harm or a disturbance to patients" for a showing of special circumstances, but that Crutchfield and Warner-Maron's "general and speculative testimony" was insufficient, since neither testified "based on any specific experience with a patient, family member, or

---

[3] The ALJ had concluded that, although a health care center's ban on *all* non-employer insignia in patient care areas is presumptively valid, a selective ban on only *certain* union insignia is not entitled to a presumption of validity, and can only be justified by a showing of special circumstances. *Healthbridge*, 2014 WL 2194550, at *7 (citing *Saint John's Health Ctr.*, 357 N.L.R.B. No. 170, 2011 WL 7052273, at *1-2 (2011)). He determined that HealthBridge could not demonstrate special circumstances, which would have required proof that the ban was "necessary to avoid disruption of health care operations or disturbance of patients," because there was no evidence to support Crutchfield's "speculative" belief that the stickers would cause resident concerns, and Warner-Maron's post-hoc expert testimony had not served as the basis of the ban. *Id.*

employee," and Warner-Maron had not even spoken to any residents or caregivers at the Centers. *Healthbridge*, 2014 WL 2194550, at *3. The majority also found the fact that HealthBridge had itself repeatedly written to inform residents about the very labor unrest that it claimed they would find upsetting significantly weakened the force of Crutchfield's and Warner-Maron's testimony. *Id.*

The entire panel agreed that HealthBridge was not entitled to remove the flyers because it did not produce any evidence to suggest the Agreements permitted it to unilaterally interpret what was a "proper" notice and remove items it considered improper. *Id.* at *1.[4]

In a partial dissent, Member Miscimarra contended that bans on union insignia in patient care areas, categorical or not, are always presumptively valid, and that the majority's logic would require HealthBridge to show patients actually were upset by the stickers in order to demonstrate special circumstances. *Id.* at *6. He argued such a requirement would force healthcare employers to allow their union practices to harm patients in order to demonstrate their actions were justified in a subsequent proceeding before the Board. He also argued that, even though she was not engaged as an expert until after the conduct at issue, Warner-Maron's testimony was relevant to determining the existence of special

---

[4] The ALJ concluded that the Union's use of the term "busted" on the flyers was not inaccurate, given that the Board had issued a complaint against HealthBridge for violations of labor law, and that even if the flyers' statements were inaccurate, "at most, it would constitute 'biased, prounion opinion,'" which was insufficient to empower HealthBridge to remove them. *Healthbridge*, 2014 WL 2194550, at *7 (quoting *Roll & Hold Warehouse & Distrib. Corp.*, 325 N.L.R.B. 41, 51 (1997)).

circumstances, because it bolstered Crutchfield's reasoning. *Id.* at \*6 n.6.

HealthBridge filed a petition for review in this Court. *See* 29 U.S.C. § 160(f). The Board petitioned for enforcement of its order. *See id.* § 160(e).

## II.

The Court upholds the Board's findings of fact if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e), (f). The Court owes "substantial deference" to the Board's factual inferences from the record before it, *Halle Enters., Inc. v. NLRB*, 247 F.3d 268, 271 (D.C. Cir. 2001) (internal quotation mark omitted), and "[w]hen the Board concludes that a violation of the Act has occurred, [the Court] must uphold that finding unless it has no rational basis or is unsupported by substantial evidence." *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 647 (D.C. Cir. 2013) (internal quotation mark omitted). "It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (internal quotation marks omitted). As for rules the Board creates for resolution of the matters that come before it, "[t]he judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule . . . must be enforced." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978). In reviewing the Board's decision, the Court must consider the "whole record," including not only materials that support the Board's findings but also "whatever in the record fairly detracts from its

weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).[5]

Under section 8(a)(1) of the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" employees' section 7 right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1). The right to self-organize "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Brockton Hosp. v. NLRB*, 294 F.3d 100, 103 (D.C. Cir. 2002) (quoting *Beth Israel Hosp.*, 437 U.S. at 491). The workplace is, in fact, a particularly appropriate place for employees to communicate about self-organization, since it "is the one place where [employees] clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 574 (1978) (alteration in original) (internal quotation marks omitted).

The Board has long recognized that employees have the right to wear union insignia in the workplace. *Washington State Nurses Ass'n v. NLRB*, 526 F.3d 577, 580 (9th Cir. 2008) (citing *London Mem'l Hosp.*, 238 N.L.R.B. 704, 708 (1978)). Bans on union insignia in the workplace are

---

[5] Our dissenting colleague, while acknowledging the deferential nature of our review of Board findings of fact, nonetheless picks apart the Board's findings because the Board did not credit all of HealthBridge's evidence and did not give HealthBridge the benefit of all inferences. That approach is decidedly inconsistent with the deferential inquiry Congress has imposed on us in the NLRA.

therefore presumptively invalid, absent a showing by the employer of "special circumstances" to support the ban. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803-04 n.10 (1945). In the healthcare context, establishing "special circumstances" requires evidence that a ban is "necessary to avoid disruption of health-care operations or disturbance of patients." *Beth Israel Hosp.*, 437 U.S. at 507.

In healthcare facilities, however, this rebuttable presumption applies only to areas where patients are not cared for. In "immediate patient care areas," bans on union insignia are *not* presumptively invalid. *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 778 (1979); *Sutter East Bay Hosps. v. NLRB*, 687 F.3d 424, 433 (D.C. Cir. 2012). Immediate patient care areas include "patients' rooms, operating rooms, and places where patients receive treatment, such as x-ray and therapy areas." *Baptist Hosp.*, 442 U.S. at 780 (quoting *St. John's Hosp. and Sch. of Nursing, Inc.*, 222 N.L.R.B. 1150, 1150 (1976)). The rationale for this rule is the need to "maintain[] a peaceful and relaxed atmosphere," since

> Hospitals, after all, are not factories or mines or assembly plants. . . . [T]he patient and his family—irrespective of whether that patient and that family are labor or management oriented—need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed.

*Baptist Hosp.*, 442 U.S. at 783-84 n.12 (quoting *Beth Israel Hosp.*, 437 U.S. at 509 (Blackmun, J., concurring in judgment)).

**A.**

We first address HealthBridge's challenge to the rule the Board applied in this case, which the firm argues is irrational and upsets the proper balance between employees' rights and healthcare providers' responsibilities to patients. In *Saint John's Health Center*, 357 N.L.R.B. No. 170, 2011 WL 7052273, at *1-2 (2011), the Board determined that only categorical employer bans on insignia in patient care areas are presumptively valid. Where, conversely, an employer banned only certain union insignia in those areas, the Board would consider the ban presumptively *invalid* because, "[h]aving allowed other types of insignia to be worn in immediate patient care areas, the [hospital] may not now rely on the protection of the presumption of validity applicable to an across-the-board ban to justify its selective ban of only the specific union insignia at issue." *Id.* at *2.

HealthBridge now asks us to overturn this presumption against selective insignia bans, but it gave the Board no opportunity to reconsider the presumption in the first instance. As relevant here, its exceptions to the ALJ's findings and conclusions of law challenge only (1) the ALJ's determination that HealthBridge did not establish special circumstances that justified its sticker ban, and (2) the ALJ's discounting of Warner-Maron's testimony. Nor did HealthBridge's detailed brief before the Board challenge the Board's presumption against selective bans; there, HealthBridge merely cited *Saint John's* as controlling authority without asking the Board to alter its policy. Brief in Support of Respondent's Exception to Administrative Law Judge's Decision at 19, 33, *Healthbridge*, 360 N.L.R.B. No. 118 (Aug. 17, 2012). In that forum, HealthBridge contended only that its selective insignia ban was *consistent* with *Saint John's*. And HealthBridge did not seek reconsideration by the Board even though the Board

split on the validity of its sticker ban and one member explicitly questioned the rationale of *Saint John's* in dissent. Only now, having obtained an unfavorable outcome from the Board, has HealthBridge changed tack, and it devotes the heart of its opening brief before this Court to arguing that the presumption is contrary to the Act. *See* Petitioner's Br. at 25-33.

Under section 10(e) of the Act, "[n]o objection that has not been urged before the Board . . . shall be considered by the court," absent extraordinary circumstances. 29 U.S.C. § 160(e); *see also Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982); *Brockton Hosp.*, 294 F.3d at 105-06. The Board's rules require parties to "set forth specifically the questions of procedure, fact, law, or policy to which exception is taken" and "concisely state the grounds for the exception," or risk waiver. 29 C.F.R. § 102.46(b). This rule "serves a sound purpose" and we are bound by it. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n.10 (1979). Indeed, the Board's order in *Saint John's* was issued eight months before HealthBridge filed its exceptions and accompanying brief, and its brief indicates HealthBridge was aware of the policy. HealthBridge had ample time to argue to the Board that the presumption is an impermissible reading of the Act.

HealthBridge claims we should overlook its failure to apprise the Board of its claim, since the Board "explicitly addressed the validity of the policy, both in the majority opinion and in the partial dissent." Petitioners' Reply at 8 (emphasis omitted). This is hard to square with the language of the Board's order, which merely restates the selective ban presumption and applies it without discussing the virtues of the rule or the extent to which it comports with the Act and its purposes. *See Healthbridge*, 2014 WL 2194550, at *2-4. True, the dissenting member explicitly questioned the wisdom

of the presumption. *See id.* at \*6. But even if this gave the majority notice the presumption itself was at issue, it is insufficient to invoke our jurisdiction. HealthBridge contends that "the critical question in satisfying section 10(e) is whether the Board received adequate notice," Petitioner's Reply at 8, but "section 10(e) bars review of any issue not *presented* to the Board, even where the Board has discussed and decided the issue," *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999) (emphasis added). Where the Board addresses an issue not raised by the parties, the party aggrieved can preserve its claim for judicial review by seeking reconsideration by the Board. *Woelke*, 456 U.S. at 665-66; *see* 29 C.F.R. § 102.48(d) (providing for "reconsideration, rehearing, or reopening of the record after the Board decision or order"). But HealthBridge never sought reconsideration in this case. HealthBridge failed to put this issue before the Board, and we consequently lack jurisdiction over this aspect of its petition.[6]

---

[6] HealthBridge also contests as retroactive the Board's application of its presumption against selective insignia bans in patient care areas in this case. Petitioners' Br. at 32-33. Under this Circuit's law, "retroactive effect is appropriate" for adjudicatory rules—such as those articulated in *Saint John's*—that are "new applications of existing law, clarifications, and additions" rather than the "substitution of new law for old law that was reasonably clear." *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (internal citation omitted). *Saint John's* constituted, at most, a more conclusive statement of the Board's prior position. *See Mt. Clemens Gen. Hosp.*, 335 N.L.R.B. 48, 50 (2001) (stating that the "normal[]" presumption of validity for bans on union insignia in patient care areas does not apply to a ban on one item where "other insignia or union buttons" are permitted). Moreover, although HealthBridge states that it "plainly relied in good faith on the traditional presumption of validity [of insignia bans] in patient-care areas" in banning the "busted" stickers, Petitioner's Reply at 9, it "fail[s] to identify any likely type of reliance." *Dist. Lodge 64, Int'l*

**B.**

We find the Board's conclusion that HealthBridge failed to demonstrate special circumstances in support of its ban supported by substantial evidence in the record. Our review of the Board's determination is necessarily limited, as "the function of striking th[e] balance [between employer and employee rights] to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB v. Local 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350 (1978) (original alterations omitted) (quoting *NLRB v. Truck Drivers Local 449, Int'l Brotherhood of Teamsters*, 353 U.S. 87, 96 (1957)). Under this deferential standard of review, HealthBridge fails to demonstrate that the Board's finding had no rational basis or was unsupported by substantial evidence.

Crutchfield testified that she thought residents who saw the stickers "would not understand this was related to a labor matter" and might fear the Centers had been "convicted of a crime," J.A. 799-800, but the stickers clearly stated that the company had been busted by the "*National Labor Board* For Violating Federal *Labor* Law," J.A. 1050 (emphasis added).

---

*Ass'n of Machinists & Aerospace Workers v. NLRB*, 949 F.2d 441, 448 (D.C. Cir. 1991). It could not, for instance, have reacted by enacting a wholesale ban on insignia in patient care areas; that ship had already sailed because it had long permitted other Union buttons in those areas. What HealthBridge seems to be saying is that, had it known it would have to establish special circumstances to justify its ban, it would have done more to determine whether patients would actually find the stickers disturbing, but since it claims patient concerns alone animated its ban, it should have done that anyway.

Far from Crutchfield's and Warner-Maron's surmise that residents would fear the shutdown of their facility and transfer to another home, the stickers made plain that the Centers had been accused of mistreating employees, not residents. An employer's violation of labor law is quite different from a criminal conviction, and HealthBridge introduced no evidence to demonstrate that its residents would think otherwise. Moreover, its own letters made clear that the charges stemmed from alleged labor law violations, not any infraction related to patient care.

The Board was justified in finding that it would be irrational to assume that residents would become distraught and traumatized by a two-and-a-half inch, ten-word sticker suggesting their nursing home had been caught violating labor law, but would be reassured by HealthBridge's repeated and detailed letters to residents and their family members threatening an imminent Union strike that could lead to replacement of the entire staff that cared for their most basic needs. The Board rightly attributed significance to HealthBridge's stream of strike-related correspondence, sent at the same time it prohibited employees from wearing the "busted" stickers. *See Healthbridge*, 2014 WL 2194550, at *3.

HealthBridge claims that the letters were designed to calm residents' fears, demonstrating the "basic disconnect between the Board's reasoning and the resident-care concerns that actually animated [HealthBridge's] actions." Petitioners' Br. at 36. But the Board reasonably concluded that if the letters were intended to comfort, they were drafted exceptionally poorly. HealthBridge's missives invoked the specter of labor unrest and potential walkouts by nurses and other healthcare workers at the Centers. HealthBridge's own expert conceded on cross-examination that communications to

residents that "imply that they might lose the care of . . . their direct care provider" could constitute emotional abuse. J.A. 740-42. As the Board points out in its brief, "Crutchfield . . . did not explain why, if [HealthBridge] deemed it appropriate to present residents with this parade of horribles," it should be expected to believe residents would have been disturbed by the stickers' message that the firm had violated labor law. Respondent's Br. at 20. As we have previously noted, "[w]e give the Board even greater deference with respect to questions of fact that turn upon motive," *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998), and here, the Board could reasonably consider "whether [HealthBridge's banning of the "busted" stickers] was based upon anti-union animus," *id*.

One can easily see how the Board could conclude that HealthBridge's letters were intended to present HealthBridge's side of renegotiation and to elicit sympathy for its bargaining position, rather than calm patients. *See, e.g.*, J.A. 1083-85 (describing Union flyers as "full of misleading and false statements . . . designed to try and harm the reputation of our Center[s] in the community" and characterizing the Board's March 21 complaint as unfounded). In confronting similar attempts by healthcare employers to stifle union solicitation, we have held that employer discrimination between a union's message about a labor dispute and the employer's own public communications on the same issue seriously weakens the justification for a ban. *Stanford Hosp. and Clinics v. NLRB*, 325 F.3d 334, 339 (D.C. Cir. 2003). We decline to sanction a blatant double standard in favor of employers in this case.

HealthBridge also failed to adduce evidence showing the stickers were objectively disturbing. In *Baptist Hospital*, the Supreme Court held that the "extensive" testimony of two

physicians at the hospital that they had observed care disrupted when patients thought their doctor was focused on anything other than patient care "related [the ban on solicitation] directly to the well-being of patients." 442 U.S. at 782-83. Key to *Baptist Hospital*'s finding of special circumstances was the doctors' and an administrator's ability to "tie[] the need for tranquility to past experiences with patients." *Washington State Nurses Ass'n*, 526 F.3d at 584 (citing *Baptist Hosp.*, 442 U.S. at 783-84); *see also Mt. Clemens General Hospital. v. NLRB*, 328 F.3d 837, 847 (6th Cir. 2003) (evidence required to rebut a presumption of invalidity must go beyond mere "speculation").

In contrast, HealthBridge produced no testimony from any healthcare professional drawn from experience in caring for patients at the Centers. The only HealthBridge employee who testified in support of the sticker prohibition was Crutchfield, an attorney who testified that her duties are to "oversee the development of labor relations strategy," human resources, and implementation of collective bargaining agreements. J.A. 766.

Furthermore, the Board reasonably found that Crutchfield's and Warner-Maron's testimony was speculative and conjectural. Crutchfield traced her opinion to no actual interactions with or comments from residents, family members, or employees. She cited no evidence showing the likelihood that patients would be harmed, either empirical or anecdotal. Nor did she attempt to differentiate the "busted" stickers from other insignia HealthBridge had permitted in the past. *See Washington State Nurses Ass'n*, 526 F.3d at 584 (testimony that nurse managers had expressed their concern about the impact of buttons on patients did not show how prohibited buttons differed from similar buttons worn before that "caused no ill effects"); *Mt. Clemens Gen. Hosp.*, 328

F.3d at 848 (no justification for ban on buttons protesting "forced overtime" in intensive care units because hospital did not show "openly contentious" buttons previously worn in patient care areas were "singularly disturbing and disruptive").

HealthBridge contends that the Board held it to a standard contrary to our precedent by requiring it show "actual complaints from residents." Petitioners' Br. at 33; *see Brockton Hosp.*, 294 F.3d at 104 (a hospital need only show "a likelihood of, not actual, disruption or disturbance") (citing *Baptist Hosp.*, 442 U.S. at 781 n.11). The Board did no such thing. In fact, it clarified that it did "not require actual harm or a disturbance to patients." *Healthbridge*, 2014 WL 2194550, at \*4. The infirmity in Crutchfield's testimony was that it was "not based on any specific experience with a patient, family member, or employee" or "specific evidence of harm or likelihood of harm to patients from employees wearing the sticker." *Id.* at \*3.

Likewise, when it demanded that Warner-Maron's opinion be "informed by actual information about or experience with the facilities, their staff, or their patients" or by speaking to "patients, family members or care givers," the Board was not requiring the stickers be shown to patients, but rather that she speak to them to gauge whether they were sufficiently vulnerable that the stickers would confuse or upset them. *Id.* at \*3. Had Warner-Maron actually spoken with residents or caregivers, she could have determined what sort of phrases or images would endanger them and whether HealthBridge's own attempts to contextualize the Board's complaint would assuage potential fears. Instead of asking patients about what they would find upsetting, however, Warner-Maron's opinion rested on googling the word "busted" and concluding the results would upset elderly

residents.[7]  Her speculation, untethered as it was from any patient or staff interviews or visits to the Centers, was of little use in determining why these stickers, in contrast to the insignia nurses have worn in the past, merited prohibition.

The dissent's point about expert evidence is misplaced. It is, of course, true that, for expert evidence to be *admissible*, it need not be based on eyewitness observation of the conduct at issue in a case, but the Board as fact-finder was entitled to determine the *weight* it would accord Warner-Maron's evidence.  The Board could reasonably discount her testimony not only because her entire review of materials in preparation for the hearing was comprised of looking at the stickers and using her internet browser to look up the word "busted," but also because her concerns about the "busted" sticker could reasonably be deemed inconsistent with her lack of concern with the patient letters sent by HealthBridge and the other union insignia that HealthBridge had previously allowed.  The Board could reasonably agree with the ALJ's assessment that Warner-Maron's opinion was speculative and of the same ilk as the *ipse dixit* that courts routinely discount as entitled to little, if any, weight.  *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "Since the Board is obviously best situated to assess the credibility and demeanor of [expert] witnesses, this court must defer to that judgment so long as it is reasonable."  *Carstens v. Nuclear Regulatory Comm'n*, 742 F.2d 1546, 1553 (D.C. Cir. 1984).

---

[7] HealthBridge caricatures the Board's concerns as relating to the fact that Warner-Maron "used Google to look up the definition of a word instead of, apparently, consulting a paper copy of Websters." Petitioners' Reply Br. at 10 n.2.  In fact, the Board considered her testimony insufficient because it did not elucidate what a *patient*— rather than an internet search engine—would have thought the term "busted" meant.

Our role is not to substitute our judgment for that of the Board; "[r]ather, a reviewing court must 'ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion.'" HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW: APPELLATE REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 176 (2007) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)). "Or, put differently, . . . whether, on the record under review, 'it would have been possible for a reasonable jury to reach the [agency's] conclusion.'" *Id.* (alterations in original) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67 (1998))." The Board's conclusion that HealthBridge's ban on the "busted" stickers violated section 8(a)(1) meets this standard, and it is therefore supported by substantial evidence in the record.[8]

## III.

The Board's finding that HealthBridge violated the NLRA by removing the "busted" notices from Union bulletin boards also finds substantial support in the record. Having extended the right to post Union notices on designated bulletin boards, the company was not free to remove them unilaterally based on its conclusion that they were "disparaging" or inaccurate.

Unions and employees have "no statutory right . . . to use an employer's bulletin board." *NLRB v. Honeywell, Inc.*, 722 F.2d 405, 406 (8th Cir. 1983) (internal quotation mark omitted). However, once an employer permits employees

---

[8] HealthBridge did not challenge the ALJ's finding that two of its Centers banned nurses from wearing the "busted" stickers in non-patient care areas in its exceptions to the Board. It has therefore waived this argument. *See* 29 U.S.C. § 160(e); 29 C.F.R. § 102.46(b).

access to a bulletin board, the union's right to post takes on the protection of section 7 of the Act. *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660-61 (6th Cir. 1983). Naturally, an employer that grants employees or a union access to bulletin boards may use its collective bargaining agreement (or past practice) to impose "limitations, restrictions, and regulations" on those rights, *Stevens Graphics, Inc.*, 339 N.L.R.B. 457, 461 (2003), but it cannot discriminate against union-related material without violating the Act. *NLRB v. Southwire Co.*, 801 F.2d 1252, 1256 (11th Cir. 1986). "The critical question is whether the employer is discriminating against union messages, or if it has a neutral policy of permitting only certain kinds of postings." *Loparex LLC v. NLRB*, 591 F.3d 540, 545 (7th Cir. 2009) (citing *Fleming Cos. v. NLRB*, 349 F.3d 968, 975 (7th Cir. 2003)).

At the outset, it is worth noting that the Union bulletin boards were located in employee break rooms. Thus, HealthBridge cannot argue that it removed the flyers to protect patients because the flyers, unlike the stickers, were not placed where patients would see them. The flyers could not pose any threat of upsetting patients, but HealthBridge argues that it was entitled to remove them as not "proper" postings under the Agreements and as unprotected Union speech under the NLRA.

HealthBridge argues that the Agreements' requirement that Union notices be "proper" permitted it to adopt a policy mandating the removal of "derogatory, disparaging, or inaccurate postings." Petitioners' Br. at 40.[9] Presumably,

---

[9] HealthBridge's argument that the Board should have resolved the flyers issue under section 8(a)(5) – which relates to the implementation of collective bargaining agreements – is mistaken. First, the Supreme Court long ago held that the Board is empowered to interpret a collective bargaining agreement in the

since Crutchfield "discretely [sic]" removed the Union's notices without first notifying the Union, *Healthbridge*, 2014 WL 2194550, at \*7, HealthBridge also believes the Agreements entitle it to unilaterally determine what postings warrant removal without consulting or even notifying the Union.[10]    *See* Petitioner's Br. at 41.    As Crutchfield

course of deciding an unfair labor practice charge under section 8(a)(1). *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 429-30 (1967).    And although the Board's decision does discuss the parties' expectations about what would constitute a "proper" notice, *see Healthbridge*, 2014 WL 2194550, at \*1, the Board's decision affirmed an ALJ order that focused not on whether HealthBridge had a right to remove the flyers under the Agreements, but whether its unilateral interpretation of the Agreements to permit it to remove flyers it deemed "abusive" or "derogatory" violated employees' right to communicate about HealthBridge's treatment of its workers.    This falls squarely under section 8(a)(1). *See Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972) ("Early in the history of the administration of the Act the Board recognized the importance of freedom of communication to the free exercise of organization rights.").

[10] Even if the Union had been aware of the prior removals, Crutchfield's prior orders to administrators to remove other Union flyers are irrelevant. *Roll & Hold Warehouse & Distribution Corp.*, 325 N.L.R.B. 41, 51 (1997) ("A union does not waive its statutory rights . . . by failure to object to past instances of unilateral changes in employment policy."), *enf'd*, 162 F.3d 513, 521 (7th Cir. 1998).

Moreover, even if HealthBridge had removed the notices pursuant to a neutral policy it consistently implemented, as it claims, their removal in the midst of a heated renegotiation of the Agreements reinforces the Board's concerns about the company's motivations.  In *Loparex*, the Seventh Circuit found it sufficient to uphold the Board's finding of a violation that management's new policy requiring prior approval of bulletin board postings followed "immediately after a three- or four-month period in which [the company] witnessed an uptick in employees' organizing efforts," even though there was no direct evidence the company had

acknowledged in her testimony, however, HealthBridge did not reserve any control over the Union bulletin boards in the Agreements and did not define what constitutes a "proper" notice. Crutchfield's belief that certain notices were inaccurate did not empower her to remove the notices, because a union's expression of opinion on a labor dispute constitutes a "proper" notice. *Monongahela Power Co. v. NLRB*, 62 F.3d 1415, 1995 WL 463108, at \*8 (4th Cir. 1995) (unpublished opinion). Having bargained with the Union to permit it to communicate with members regarding the status of collective bargaining, HealthBridge was not free to "stifle any dissemination of information about" the Board's charges, even if it considered the Union's portrayal of the facts wrong. *Monongahela Power Co.*, 314 N.L.R.B. 65, 68-69 (1994); *cf. Eastex, Inc.*, 437 U.S. at 573 ("Petitioner's only cognizable property right . . . is in preventing employees from bringing literature onto its property and distributing it there – not in choosing which distributions protected by § 7 it wishes to suppress."). And the mere fact that HealthBridge considered the notices disruptive or unpleasant is insufficient to warrant their removal. *NLRB v. Container Corp. of Am.*, 649 F.2d 1213, 1215 (6th Cir. 1981).

HealthBridge claims that, even though the notices were protected under section 7, it was entitled to remove them because of what it terms their "abusive and disparaging" content. Petitioners' Br. at 45. Union bulletin board notices, however, are protected even if "abusive" or "insulting." *Union Carbide Corp.*, 714 F.2d at 661 (citing *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418

removed union notices. 591 F.3d at 547; *cf. Sutter East Bay Hosps.*, 687 F.3d at 433 (upholding the Board's finding that a hospital changed solicitation rules in order to "squelch union activity" when it suddenly began to prohibit outside groups from meeting in the cafeteria).

U.S. 264, 283 (1974)). Only two exceptions apply to this protection. First, "where the bulletin boards threaten to become a battleground for competing groups," the employer may regulate materials the union posts. *Union Carbide Corp.*, 714 F.2d at 661 (internal quotation marks omitted). Second, even "'the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth,' so long as the allegedly offensive actions are directly related to activities protected by the Act and are not so egregious as to be considered indefensible." *Container Corp. of Am.*, 244 N.L.R.B. 318, 319 (1979) (quoting *NLRB v. Cement Transp., Inc.*, 490 F.2d 1024, 1029-30 (6th Cir. 1974)). The "busted" notice does not relate to any "battle" among competing unions, and is not so egregious that it loses the protection of the Act. In *Container Corporation*, the Sixth Circuit held that language comparing a manager to a slave driver who would be happy paying his "chain gang" retained the protection of section 7. 649 F.2d at 1214-15. In another case, it upheld a finding that the company improperly removed a union posting for criticizing the company's safety record. *United Parcel Serv., Inc. v. NLRB*, 228 F.3d 772, 781 (6th Cir. 2000). Similarly, telling readers that HealthBridge was "exploiting the elderly and their caregivers by lying, cheating and even law-breaking" and wanted "to destroy our jobs, our families and our neighborhoods," J.A. 1062-67, was certainly "unpleasant," *Container Corp.*, 649 F.2d at 1216, but nonetheless was protected by the Act. We are left with the impression that HealthBridge attempted to remove the notices "simply because it disagree[d] with their contents or [found] them distasteful." *Monongahela Power Co.*, 1995 WL 463108, at *9. The Board was within reason in concluding that the Union's flyers were a protected union communication. We therefore uphold the Board's determination that HealthBridge's removal of the "busted" notices violated section 8(a)(1) of the Act.

## IV.

For the foregoing reasons, we deny the petition for review and grant the cross-application for enforcement.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part: Conspicuously absent from either the NLRB's order or the majority opinion is recognition of a poignant reality: nursing homes provide critical care for the most vulnerable Americans. They compose our chronically "sickest" population; "[o]nly a hospital patient would be considered sicker." Warner-Maron Trial Test. 541. Indeed, their residence in a nursing home typically means that they cannot "live outside an institution" because they "require . . . care and supervision." *Id.* Many suffer from "multiple illnesses, comorbidities [and] superimposed cognitive deficits"; accordingly, they depend on caregivers "to bathe, dress, feed, toilet" and "turn" them. *Id.* And, of particular import for this case, "many of them are vulnerable because of cognitive impairment due to dementia, loss of memory, Alzheimer's disease" and "medication effects." *Id.* at 543. The United States Supreme Court has reminded us that the "patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed." *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 783 n.12 (1979). The High Court's admonition, uniquely fitting in the nursing-home context, ought to animate this case.

Regretfully, it does not. *No* record evidence, let alone *substantial* evidence, supports the Board's conclusion that HealthBridge failed to show "a likelihood of . . . disruption or disturbance" by allowing, in particular, its nursing staff, *inter alia* to parade the BUSTED sticker while attending residents. *Brockton Hosp. v. NLRB*, 294 F.3d 100, 104 (D.C. Cir. 2002). Because I cannot join my colleagues' disposition of this issue,[1] I respectfully dissent.

---

[1] I agree that HealthBridge's removal of the BUSTED flyer from union-designated bulletin boards constituted an unfair labor practice. I also agree with my colleagues that HealthBridge waived

## I.

The New England Health Care Employees Union, District 1199, SEIU, AFL-CIO (the Union) distributed the BUSTED stickers to many HealthBridge employees, including members of the nursing, maintenance, cafeteria and housekeeping staffs, at HealthBridge's six nursing-home centers, around 7:00 AM on March 25, 2011 and the employees who donned them did so until about 1:00 PM the same day. The stickers were removed after Lisa Crutchfield, HealthBridge's Senior Vice President of Labor Relations, ordered them to do so because she feared they would confuse the "elderly, vulnerable folks" living at the facilities. Crutchfield Trial Test. 606. Crutchfield, a HealthBridge employee since November 2005, testified that she works

---

its challenge to the Board's presumption of invalidity for selective insignia bans in immediate-patient-care areas. *See* Maj. Op. 12–14. I note, however, that the Board has never provided a good—or really any—justification for presuming that selective bans on union insignia in patient-care areas are invalid while presuming that categorical bans are valid. Given the Supreme Court's observation that "[h]ospitals carry on a public function of the utmost seriousness and importance," that they "give rise to unique considerations that do not apply in the industrial settings with which the Board is more familiar" and, critically, that "[t]he Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized," *Baptist Hosp.*, 442 U.S. at 790, one would expect more than the cursory explanation courts have seen to date. *Cf. id.* at 791 (Burger, C.J., concurring in judgment) ("I would think no 'evidence' is needed to establish the proposition that the primary mission of every hospital is care and concern for the patients and that anything which tends to interfere with that objective cannot be tolerated. A religious choir singing in a hospital chapel may well be desirable but if that interferes with patient care, it cannot be allowed.").

"very closely" with HealthBridge's nursing-home centers and is in them "very often," "walk[ing] the floors" and meeting with employees, managers and administrators. *Id.* at 602–03. Based on this concern—and based on her years of employment in the healthcare industry, including at least ten years at HealthBridge—Crutchfield reasoned that:

> the sticker itself says busted with a judge's gavel. And it's saying that the center was busted. It suggests some kind of crime. I was concerned that residents . . . would not understand this was related to a labor matter and might be concerned for a larger issue. What is happening here at this center? Has this center been convicted of a crime? Is that impacting the care that I'm receiving? So my concern was that residents may be upset by this, may not understand it and it may create confusion and disruption for them.

*Id.* at 605–06. There is no dispute that Crutchfield's prohibition applied only in areas where residents frequented; per her instructions, employees were free to wear the stickers elsewhere.[2] The Board did not counter Crutchfield's testimony that her primary focus is "to protect those residents and to care for those residents." *Id.* at 605.

HealthBridge supplemented Crutchfield's testimony with that of Ilene Warner-Maron, a registered gerontological nurse who has worked with the elderly since 1975. Warner-Maron

---

[2] Two of the six HealthBridge centers apparently banned the BUSTED sticker in all areas, despite Crutchfield's instruction that displaying the sticker was permissible in non-patient-care areas. I agree with my colleagues that HealthBridge failed to argue in support of the two centers' total ban. *See* Maj. Op. 21 n.8.

is an adjunct college professor at Saint Joseph's University in Philadelphia, teaches nursing licensure classes on gerontology and has administered nursing facilities. She has three masters degrees—one in social gerontology, one in health administration and one in law and social policy—and a doctorate degree in health policy. At the time of her testimony, Warner-Maron had been admitted as an expert in fifty-six cases in more than ten states regarding standards of care in the healthcare industry and she had reviewed approximately 2,940 cases *in toto*. She was qualified as an expert witness in this case without objection.

During her testimony, Warner-Maron first emphasized the obvious—that nursing homes care for "vulnerable adults who have physical and/or cognitive impairment [and] who are dependent on the facility staff to render care, sometimes very personal, intimate care; bathing, grooming, toileting, diapers, those types of things." Warner-Maron Trial Test. 538. She was "concerned looking at the busted sticker, because of the inference of the word busted." *Id.* Specifically, she testified that "[b]usted does not have a positive connotation. It's strictly negative. It infers something is broken. It could also infer bankruptcy. It can infer arrest. *There's no positive way to interpret the word busted.*" *Id.* (emphasis added). In her expert opinion, a sticker:

> with the red word busted as the principle [sic] focus . . . being wor[n] on the uniform of employees at chest level, . . . the nursing home resident would see that sticker, see that word busted and could easily become agitated, upset, worried, concerned about the inference of that word busted being [used] by their caregiver.

*Id.* at 538–39. Warner-Maron was not only concerned that the BUSTED sticker could cause harm *to* the residents; she was also concerned that it could instigate harm *by* the residents, testifying that the residents might "become upset by this sticker and become agitated and even combative towards the caregivers . . . because of the implications of the wording on the sticker." *Id.* at 548; *see also id.* ("[Y]ou don't want your residents agitated and striking out at the very caregivers that are providing care.").

According to Warner-Maron, because each BUSTED sticker identified a HealthBridge facility, the residents would infer that the care centers "violated some law," which violation "could potentially cause that resident to have to be moved." *Id.* at 539. The consequences of such an inference can be dire. During her multi-decade career, Warner-Maron personally observed "transfer trauma," which occurs when "someone who's used to being in a facility" is "evacuated to another facility" and experiences "difficulty adjusting." *Id.* at 547. Transfer trauma causes, in turn, "an increase in the risk of death, . . . depression and psychiatric harm" among nursing-home residents. *Id.* She emphasized that the fear is "very problematic for people" who know "they can't return to an independent life in the community" and who are thus "dependent upon a facility to maintain their safety and care." *Id.* Based on her experience, transfer trauma can occur when a resident is faced with the mere "*threat* of a facility being closed." *Id.* (emphasis added).

The Board did not rebut any of the aforementioned testimony. HealthBridge had the burden to demonstrate "only a likelihood of, not actual, disruption or disturbance" to justify barring its employees from wearing the BUSTED sticker in patient-care areas. *Brockton Hosp.*, 294 F.3d at 104; *see also Baptist Hosp.*, 442 U.S. at 781 n.11 ("a hospital

may overcome the presumption by showing that solicitation is *likely* either to disrupt patient care or disturb patients" (emphasis added)). The Board has long recognized that a healthcare facility is under no obligation to "wait for the awful moment when patients or family are disturbed by a button before it may lawfully be restricted." *Sacred Heart Med. Ctr.*, 347 N.L.R.B. 531, 533 (2006), *vacated on other grounds by Wash. State Nurses Ass'n v. NLRB*, 526 F.3d 577 (9th Cir. 2008). In my view, HealthBridge's submission—the uncontroverted testimony of two healthcare professionals explaining why the particulars of the BUSTED sticker were likely to upset HealthBridge residents to the point of an "increase in the risk of death, . . . depression and psychiatric harm"—plainly satisfied this burden. Warner-Maron Trial Test. 547. Short of allowing the BUSTED stickers to in fact harm a resident, I cannot think what HealthBridge could have done other than ban the stickers in patient-care areas. *See also Baylor Univ. Med. Ctr. v. NLRB*, 662 F.2d 56, 62 (D.C. Cir. 1981).

## II.

Notwithstanding the uncontroverted testimony, the Board found that HealthBridge failed to establish the BUSTED sticker would likely disturb or disrupt its residents. *HealthBridge Mgmt., LLC*, 360 N.L.R.B. No. 118 (May 22, 2014). In so doing, it concluded that (A) Crutchfield's testimony was based on her mere speculative belief and conjecture; (B) HealthBridge's purported concern for its residents was belied by letters it sent informing them of a labor dispute; and (C) Warner-Maron provided only speculative, after-the-fact testimony about the sticker's likely effect on residents. *See id.* The majority agrees, relying (at least in part) on our standard of review. Granted, substantial-evidence review is "limited" and "deferential." Maj. Op. 15.

But it has never been "so deferential that the court will merely act as a rubber stamp for the Board's conclusions." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445 (D.C. Cir. 2004). Indeed, "[w]hen the Board's findings lack . . . support in the record, the reviewing courts must set them aside, along with the orders of the Board that rest on those findings." *Baptist Hosp.*, 442 U.S. at 782. Properly understood, "the substantial evidence test requires a case-by-case analysis and a review of the whole record" and it "requires a reviewing court to take into account whatever in the record fairly detracts from the Board's conclusions." *Wash. State Nurses Ass'n*, 526 F.3d at 580 (quotation marks omitted). At bottom, "[w]e review the Board's application of the law to the facts for reasonableness." *S. New England Tel. Co. v. NLRB*, No. 11-1099, 2015 WL 4153873, at *2 (D.C. Cir. July 10, 2015).

The majority's analysis, which largely tracks that of the Board, allows the Board to apply "the 'special circumstances' exception in an unreasonable way." *Id.* at *3. By repeating many of the same factual, legal and analytical errors (while adding a few of its own), my colleagues endorse the Board's placing of "an unreasonably high and unrealistic burden" on all healthcare facilities, one that would require them to wait and see whether union activity in fact harms its residents before prohibiting the same in patient-care areas. *HealthBridge Mgmt., LLC*, 360 N.L.R.B. No. 118 (Miscimarra, concurring in part and dissenting in part). I agree with the dissenting Board member that the Board's decision defies "experience, intuitive reasoning and common sense." *Id.*; *see also S. New England Tel. Co.*, 2015 WL 4153873, at *1 ("Common sense sometimes matters in resolving legal disputes."). And on further examination, the reasons on which my colleagues rely collapse under their own weight.

8

**A.**

My colleagues discredit Crutchfield's belief that "residents who saw the stickers would not understand this was related to a labor matter and might fear the Centers had been convicted of a crime," observing that the stickers state that HealthBridge had been busted by the "*National Labor Board* For Violating Federal *Labor* Law." Maj. Op. 15–16 (emphases in original) (quotation marks omitted). I believe their skepticism is unfounded. The record is replete with evidence documenting the extraordinary difficulties that nursing-home residents face, "both on the physical and on the cognitive aspect." Warner-Maron Trial Test. 542; *see also, e.g.*, *id.* at 538–40, 547; Crutchfield Trial Test. 602–06. In my view, it is wholly unreasonable to presume that elderly residents who depend on staff "to bathe, dress, feed, toilet" and "turn" them can appreciate the difference between a violation of the National Labor Relations Act and a violation of any other law. Warner-Maron Trial Test. 541. Simply because *my colleagues* understand that "[a]n employer's violation of labor law is quite different from a criminal conviction" does not mean that elderly, ill residents—assuming they are physically able to read—can appreciate the difference. Maj. Op. 16.

Even if we assume that HealthBridge's residents have a nuanced understanding of federal law, the majority mistakes the gravamen of Crutchfield's concern. She did not fear that HealthBridge's residents would misunderstand the *substance* of an alleged legal violation (*i.e.*, criminal law, labor law or something else), or even the *victim* thereof (*i.e.*, a resident, an employee or someone else). Rather, she was plainly concerned that the BUSTED stickers would cause fear about the *consequences* of an alleged legal violation—*i.e.*, whether a resident would wonder if HealthBridge's being "BUSTED"

would "impact[] the care that I'm receiving?" Crutchfield Trial Test. 606. This concern is the same from a resident's perspective whether HealthBridge was convicted of a crime, in bankruptcy proceedings or even liable for a labor-law violation. And the unrebutted testimony from Warner-Maron indicates that Crutchfield's concerns were well-founded: "Q. . . . So as a patient I would be concerned I'm going to lose care, correct? A. Lose care, lose safety, lose . . . the security of that facility. Yes." Warner-Maron Trial Test. 558.

**B.**

My colleagues also find that the Board reasonably concluded it was "irrational" for HealthBridge "to assume that residents would become distraught and traumatized by a two-and-a-half inch, ten-word sticker" but "would be reassured by [its] repeated and detailed letters . . . threatening an imminent Union strike." Maj. Op. 16. Their conclusion, I fear, both discounts the impact of the BUSTED stickers and exaggerates HealthBridge's letters and, in so doing, mistakenly equates the two. At bottom, "[t]here's no positive way to interpret" the BUSTED stickers, Warner-Maron Trial Test. 538, while HealthBridge's letters were intended to reassure its residents. Undoubtedly, HealthBridge's correspondence could have adopted a more neutral tone regarding the labor dispute. But neither the tone of HealthBridge's words nor my colleagues' characterization of the letters as "drafted exceptionally poorly," Maj. Op. 16, detracts from the underlying message HealthBridge wanted its residents and their families to hear, especially in the two letters it sent before the BUSTED sticker appeared:

**First Letter:**

- "As you may know, [HealthBridge] has been in negotiations with [the Union] . . . . We have

approached these negotiations with an open mind and a sincere desire to reach an agreement with the Union *that will enable us to continue providing the highest quality care and services to you and your fellow residents*."

- "We need to negotiate a contract that reflects the new reality of our industry *to ensure that you continue to receive the best possible care*."

- "Let me assure you that our labor negotiators are doing everything possible to avert the possibility of a strike . . . .  Since this Union has a long history of calling strikes, however, we take this matter very seriously and are *well prepared in the event the Union moves forward with plans for a strike* . . . ."

- "We are working with the Department of Public Health and have developed a comprehensive contingency plan to ensure that you continue to receive excellent clinical care and services without interruption in the event of any strike, work stoppage or other labor dispute.  We have mobilized our regional operational and clinical teams and are ready with a full complement of replacement staff to manage and run our Center.  All food and medical supplies will be available to meet each resident's individual clinical and nutritional needs.  We also have retained a special security team to ensure that you and your family are comfortable and secure."

- "[I]f the Union should call a strike, our Center's operations *will continue as usual*—including admitting new residents."

1st Ltr. from Administrators to HealthBridge Resident and Family Member 1 (March 2011) (emphases added).

**<u>Second Letter:</u>**

- "We need to negotiate a new agreement that reflects the reality of our industry today so *we can continue providing the highest quality care to you and your fellow residents*."

- "Thus far, we have not received a strike notice from the Union . . . .  Please be assured that <u>we do not want a strike at our Center</u> and our negotiations team is doing *everything possible to avert the possibility of a strike*."

- "[I]f the Union should call a strike as they threatened to do in the very first negotiations meeting, we want you to know that we are *fully prepared to continue all of our Center's normal operations*."

- "As we anticipated, due to the current economic climate, we have had a tremendous response to our recruitment of replacement staff in the event we need them.  You can feel confident that, if any kind of strike, work stoppage or other labor dispute should occur, *we will have a full complement of highly-qualified [sic] replacement staff to run our Center*."

2d Ltr. from Administrators to HealthBridge Resident and Family Member 1 (March 2011) (emphases added) (underline in original). Simply put, HealthBridge informed its residents—truthfully—that the Union had threatened to strike but that HealthBridge was nonetheless "fully prepared to continue all . . . normal operations." 2d Ltr. at 1. Contrast this positive message with the image that greeted the "elderly, vulnerable folks" living at HealthBridge's facilities, Crutchfield Trial Test. 605, on the morning of March 25, 2011:



Given the emotional and psychological damage nursing-home residents risk if they perceive the "threat of a facility being closed," Warner-Maron Trial Test. 547, HealthBridge's commitment to "ensure that [its residents] continue to receive excellent clinical care and services without interruption in the event of any strike, work stoppage or other labor dispute," 1st Ltr. at 1, is consistent with common sense and with

HealthBridge's caring concern for them.[3] That the letters placed HealthBridge's negotiating position in a favorable

---

[3] The majority notes that "HealthBridge's own expert conceded on cross-examination that communications to residents that imply that they might lose the care of . . . their direct care provider could constitute emotional abuse." Maj. Op. 16–17 (ellipses in original) (quotation marks omitted). Read in context, however, her testimony did *not* suggest an equivalency between HealthBridge's letters and the BUSTED sticker:

> Q. So if I told a patient hey, tomorrow none of the [caregivers] that you . . . know, are familiar with, are going to be here and there's going to be brand new people taking care of you—
>
> A. It would be upsetting. I don't know if that would rise to the level of emotional abuse, but depending on that individual, if that individual had a relationship with particular aides and the loss of that aide or those aides would cause them to become emotionally in despair, then for that individual it may be a form of abuse, yes.
>
> Q. I mean it would be emotionally abusive, don't you think, if I went to bed one night with my [caregiver], and the next morning I woke up, and she wasn't there and some stranger was there?
>
> A. Well, that's the nature of working in institutions. You don't always have the same people taking care of you. But . . . people move in and out of the industry frequently. We try to minimize turnover whenever we can, but we don't want to force the turnover of people. We don't want to cause people to feel that the people that they've associated with for periods of time are going to be lost to them for some purposeful reason.

Warner-Maron Trial Test. 560. In other words, Warner-Maron acknowledged that some nursing-home residents experience

light does not mean that treating them differently from the BUSTED sticker would "sanction a blatant double standard in favor of employers." Maj. Op. 17. Far from it. Even the best intentions—and there is no indication that HealthBridge had anything but good intentions—are not always expressed with superior draftsmanship.

Moreover, the majority sweeps past the wholly unrebutted expert testimony (which makes the self-evident point) that there is plainly a difference between the BUSTED sticker and a letter addressed to a resident. *See* Warner-Maron Trial Test. 562. The sticker is "very visible." *Id.* This "visible threat on the clothing of the aide," which is "in close proximity to the resident," is necessarily not removed as is "opening . . . and reading a letter." *Id.* Further, any potential harm caused by the letters' content was blunted because "often the letter goes to the family member rather than to the resident, or if it's brought to the resident it's brought by the social worker who's helping that resident read the letter and not just delivering the letter and walking away." *Id.*

In my view, the unrebutted record evidence compels the conclusion that HealthBridge, in sending its letters *and* in ordering the removal of the BUSTED sticker, acted out of concern for its residents and "likel[y]" avoided an "actual[] disruption or disturbance" at its nursing-care facilities. *Brockton Hosp.*, 294 F.3d at 104; *see also Baptist Hosp.*, 442

---

distress because their caregivers are at times temporary but that it is impossible to avoid this type of stress in all instances. Warner-Maron's testimony on this point contrasts sharply with her opinion that "the wording of [the BUSTED sticker], and the type and the red writing of it, with the gavel underneath, is easily viewed as an implied threat that something is amiss, that something is wrong, that there's something threatening." *Id.* at 559.

U.S. at 781 n.11.  It should be lauded—not rebuked—for its efforts.

## C.

Finally—and perhaps most remarkably—my colleagues assert that HealthBridge "failed to adduce evidence showing the stickers were objectively disturbing."  Maj. Op. 17.[4]  As discussed, both Crutchfield and Warner-Maron provided extensive testimony regarding the damage the BUSTED sticker would have caused HealthBridge's residents.  The majority's criticism of their testimony does not withstand scrutiny.

The majority, like the Board, faults Crutchfield for not basing her testimony on "actual interactions with or comments from residents, family members, or employees."

---

[4] My colleagues contrast the evidence here with that in *Baptist Hospital*, a Supreme Court case in which hospital employees testified that "anytime we do anything that lets a patient or [his] family see that we have our mind *on anything but patient care*, this is very disruptive to the patient and sometimes affects the patient's ability to recover."  442 U.S. at 783 (emphasis added).  But there is no daylight between Baptist Hospital and HealthBridge in this regard.  The Baptist Hospital employees' testimony applies fully to the residents of the HealthBridge facilities.  I fail to see how requiring Warner-Maron to question HealthBridge residents to gauge the severity of their impairments would be constructive.  *Cf.* Maj. Op. 19.  Rather, the testimony the Supreme Court highlighted in *Baptist Hospital* underscores that *all patients* and *all families*, including those at HealthBridge facilities, "need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed."  442 U.S. at 783 n.12.

Maj. Op. 18.[5]  It rejects HealthBridge's argument that such evidence would require it to demonstrate "actual harm or a disturbance to patients."  Maj. Op. 19 (quotation mark omitted).  But my colleagues make no attempt to explain the difference between "actual harm or a disturbance" (which, they admit, *cannot* be required) and "specific experience with a patient, family member, or employee" or "specific evidence of harm or likelihood of harm to patients from employees wearing the sticker" (which, in their view, *is* required). *Id*.  In my view, HealthBridge did all it could short of waiting "for the awful moment when patients or family are disturbed by a button" before acting to prevent potentially serious injury to, or distress, its residents.  *Sacred Heart Med. Ctr.*, 347

---

[5]  The majority also criticizes Crutchfield as merely "an attorney who testified that her duties are to oversee the development of labor relations strategy, human resources, and implementation of collective bargaining agreements." Maj. Op. 18 (quotation marks omitted).  I note that the Supreme Court, in *Baptist Hospital*, relied not only on medical witnesses but also on the "Hospital's Vice President for Personnel Services," who testified that the rule limiting union activity in that case "was adopted because of concern about the ill effects of union organizational activity on patients" and that "[t]he general purpose of the rule . . . [wa]s to protect the patients and their families from the disquiet that might result if they perceived that the Hospital's staff had concerns other than the care of patients."  442 U.S. at 782–83.  At a minimum, the High Court's reliance on a non-medical witness suggests that the testimony of a ten-year HealthBridge employee who works "very closely with the centers" and is "in the centers very often," "walk[ing] the floors" and "spend[ing] time meeting" with employees, managers and administrators should not be so easily cast aside. Crutchfield Trial Test. 602–03.

17

N.L.R.B. at 533.[6] The majority's position may force hospitals and healthcare facilities to inch closer and closer to actual

---

[6] My colleagues fault Crutchfield for failing to "differentiate the 'busted' stickers from other insignia HealthBridge had permitted in the past." Maj. Op. 18. They ignore Warner-Maron's testimony on that precise issue:

Q. . . . did you have the same expert opinion regarding any of the other buttons or stickers that you reviewed?

A. No, I had no trouble with any of those other[] stickers.

Q. And why is that?

A. The other stickers don't have that wording. They don't have that connotation. They don't threaten. Even the exhibit 9 with the Grinch, the intent is to of course bring attention to the Union, but it's not threatening. It's a picture of a cartoon character. So I didn't find anything in the other stickers in any way to be threatening, to exhibit any kind of potential for emotional abuse on the part of a resident, none of these, just the one that says busted in red with the gavel and the words underneath it inferring that the nursing home has violated a law.

Q. And what about General Counsel's exhibit 4, the one that says fight in it, does that make any difference?

A. I think the way that the fight is, it's couched between a vision, a fight and union, and I did not take away . . . the inference that this sticker meant that the aide should fight or that there's an ongoing fight going on. So I think the way that the word fight is positioned between vision and union does not have anywhere near the same effect as the sticker that we're talking about with the word busted.

harm to generate evidence "specific" enough to defend against an unfair-labor-practice charge.  Maj. Op. 19.

The majority's rejection of Warner-Maron's testimony fares no better.  Like the Board, my colleagues demand that Warner-Maron's opinion be "informed by actual information about or experience with the facilities, their staff, or their patients or by speaking to patients, family members or care givers."  Maj. Op. 19 (quotation marks omitted).  Their demand misconstrues elementary principles of expert testimony.[7]  "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are *not based on firsthand knowledge or observation*." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) (emphasis added) (citation omitted); *see also United States v. Mejia*, 597 F.3d 1329, 1339 (D.C. Cir. 2010) (same); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989) ("A personal examination of the person or object of the expert's testimony is not required"); *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998); *Sweet v. United States*, 687 F.2d 246, 249 (8th Cir. 1982); DAVID H. KAYE ET AL., THE NEW WIGMORE: A TREATISE ON EVIDENCE, § 4.2 (expert witnesses "are exempted from the traditional personal-

---

Warner-Maron Trial Test. 540–41.  As with much of HealthBridge's evidence, the Board made no attempt to rebut it, instead ignoring or dismissing it.  Our responsibility, however, is to "take into account whatever in the record fairly detracts from the Board's conclusions." *Wash. State Nurses Ass'n*, 526 F.3d at 580 (quotation marks omitted).

[7] The Board, per regulation, generally applies the Federal Rules of Evidence.  *See* 29 C.F.R. § 102.39 ("Any . . . proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States . . . .").

knowledge requirements, and may therefore give opinions without personal knowledge of the underlying facts"); 3 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 389, at 657 (1979) (FED. R. EVID. 703 "diminishes the need for the expert to have firsthand knowledge concerning the matters in issue").

Indeed, "firsthand observations" constitute but one of "three categories of materials" that "may form the basis for expert judgments." DAVID H. KAYE ET AL., THE NEW WIGMORE: A TREATISE ON EVIDENCE, § 4.1. The other two include reviewing materials presented at trial and materials furnished outside court. FED. R. EVID. 703 advisory committee's note (1972). Warner-Maron viewed the BUSTED sticker before trial and again while testifying, considered the indisputably negative word BUSTED and the other inflammatory imagery on the sticker,[8] applied her expertise and opined that the BUSTED sticker was likely to distress HealthBridge's residents. Her testimony, then, fits comfortably within the accepted scope of expert opinion. Rather than correcting the Board's incorrect application of evidentiary rules, my colleagues endorse it. *See* Maj. Op. 20 (Warner-Maron's "speculation, untethered as it was from any patient or staff interviews or visits to the Centers, was of little use in determining why these stickers, in contrast to the insignia nurses have worn in the past, merited prohibition").[9]

---

[8] Both the Board and the majority criticize Warner-Maron because she searched Google for the word "busted." *See* Maj. Op. 20 & n.7 (quoting Pet'r's Reply Br. 10 n.2). Neither, however, suggests that there is any "positive way to interpret the word busted." Warner-Maron Trial Test. 538.

[9] The majority suggests that my point about Warner-Maron's expert testimony "is misplaced," noting that the Board "was entitled to determine the *weight* it would accord Warner-Maron's

The inescapable implication of the majority's conclusion is this: because HealthBridge allowed its employees to display *other* union insignia in patient-care areas in the past, it had to identify a resident (or a family member) who had seen the BUSTED sticker (or perhaps similarly inflammatory union insignia) and reacted adversely to it in order to prohibit its employees from wearing the BUSTED sticker. The Supreme Court,[10] this Court[11] and the Board[12] have made plain that this is not the law.

---

evidence." Maj. Op. 20 (emphasis in original). But notwithstanding the "weighing of expert opinions is the province of the ALJ, there must be some indication in the ALJ's decision that the weighing was conducted in a reasoned manner." *Peabody Coal Co. v. Dir., Office of Workers' Comp. Programs*, 972 F.2d 178, 182 (7th Cir. 1992). Indeed, "it makes little sense to use scientific standards in performing the gatekeeping function [at the admissibility stage] and then permit the dispute on the merits to be resolved by arbitrary considerations." *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001). In my view, discounting out-of-hand expert testimony because it was not based on first-hand observations *is* arbitrary, especially in the absence of contrary testimony. For this reason, my colleagues' plea for deference rings hollow. *See also Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974) (vacating and remanding because, *inter alia*, "[t]h[e] expert judgment is neither met nor contradicted by any other expert judgment"). The *ipse dixit* label the majority attempts to fix on Warner-Maron's testimony, *see* Maj. Op. 20, is a much closer fit on the Board—the decision-maker whose only reasoning is "because we say so."

[10] *Baptist Hosp.*, 442 U.S. at 781 n.11 ("[A] hospital may overcome the presumption by showing that solicitation is *likely* either to disrupt patient care *or* disturb patients." (first emphasis added)).

[11] *Brockton Hosp.*, 294 F.3d at 104 ("[T]he Hospital had to show only a likelihood of, not actual, disruption or disturbance.").

**III.**

I end where I began. The Supreme Court has commented that "the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed." *Baptist Hosp.*, 442 U.S. at 783 n.12. Then–Chief Justice Burger, writing separately in *Baptist Hospital*, believed that "*no 'evidence' is needed* to establish the proposition that the primary mission of every hospital is care and concern for the patients and that anything which tends to interfere with that objective cannot be tolerated." *Id.* at 791 (Burger, C.J., concurring in judgment) (emphasis added). And more than three decades after *Baptist Hospital*, Warner-Maron, in explaining the nature of the caregiver/nursing-home resident relationship, underscored why care and concern for residents must take priority:

> [B]ecause of the intimate nature of the interaction between the caregiver and the resident, the caregiver has to be able to have a rapport with that resident. That resident has to be able to trust, in their most naked form, because they are in their most naked form, during most of this care, that the caregiver will provide safe, competent care to them. So it's a very personal relationship between the [caregiver] and the resident.

Warner-Maron Trial. Test. 544.

---

[12] *Sacred Heart Med. Ctr.*, 347 N.L.R.B. at 533 ("[A] hospital need not wait for the awful moment when patients or family are disturbed by a button before it may lawfully be restricted.").

The Union's BUSTED sticker display interfered with this intimate and personal relationship in a callous and dangerous manner. HealthBridge acted reasonably, legally and compassionately to prohibit its employees from wearing the BUSTED sticker in patient-care areas. In my view, it met its burden before the Board as well as its burden—before us—of establishing that the Board's contrary conclusion fails the substantial-evidence test. Accordingly, I respectfully dissent.